R. J. STEVEN, Plaintiff-Appellee, *v.* FALESE LAND COMPANY *et al.,* Defendants-Appellants.

Second District   No. 75-196

Opinion filed June 30, 1977.

232

Imming, Travis & Faber and Robert S. Bailey, both of Chicago, and George E. Faber, of Elgin, for appellants.

Glenn & Logue, of Mattoon, for appellee.

Mr. JUSTICE WOODWARD delivered the opinion of the court:

R. J. Steven, a doctor of Mattoon, Illinois, is the plaintiff-counterdefendant-appellee and will be referred to herein as "Steven." Floyd Falese was involved in the various transactions leading to this litigation and during all times mentioned was a real estate broker in Dundee, Illinois, and will be referred to herein as "Falese." The defendant-counterclaimant-appellant estate of Floyd Falese, deceased, will be referred to as the "estate" and the defendant-counterclaimant-appellant Falese Land Company will be referred to as the "land company." In referring to both the estate and the land company, we will call them the defendants.

This litigation concerns various agreements between Steven and Falese and the acquisition, financing, development and subdivision of a 160-acre parcel of real estate in Kane County herein referred to as the Whitney Farm. Steven and Falese began this venture in 1962; in 1963, Falese organized the land company, a corporation wholly owned by him; it engaged in various business activities in which Falese was involved including the Whitney Farm; it was a subchapter S corporation for income tax purposes. Falese died on March 8, 1970, and Jacqueline Falese, his widow and the sole beneficiary of his estate, was appointed executrix and as such executrix is a defendant-counterclaimant-appellant in this proceeding and will be referred to as "executrix."

The transactions preceding this litigation began on or about February 13, 1962, when Steven received a letter from the attorney and agent for all the beneficiaries of a certain land trust of the Elgin National Bank wherein the beneficiaries offered to sell the Whitney Farm for $128,000. At this time, Falese owned a 40% beneficial interest in the land trust that held title to the property. Upon receipt of this offer, Steven and Falese entered into the first agreement pertaining to the development of the Whitney Farm; it provided that, if Steven accepted the pending offer of the beneficiaries of the land trust to sell, he would pay the full purchase price of $128,000; that title would be placed in his name and in the name of Falese as tenants in common; that Falese would subdivide the property into approximately 300 lots and would pay for the installation of roads, land planning, title charges, attorneys' fees and such other expenses as might be necessary to subdivide the property. This first agreement further provided that upon subdivision and sale of the lots, Steven would receive a sum equal to the cost of the land and thereafter Falese would receive $600 per lot in payment for the cost of subdividing and other charges enumerated above; lastly, any balance of funds would be divided equally.

After making this first agreement with Falese, Steven accepted the

offer of sale submitted by the agent and attorney for the land trust beneficiaries. Then, Steven and Falese entered into a formal contract to buy the Whitney Farm for the sum of $128,000; the sellers designated in this contract were "Gertrude G. Holt, Floyd Falese and Francis T. Crowe as directing beneficiaries" of a certain trust with the Elgin National Bank, as trustee; Steven and Falese as tenants in common were designated as purchasers.

On March 23, 1962, a second agreement pertaining to the development of the Whitney Farm was entered into by Steven, Falese and Daniel A. Hoagland, which provided that Steven would pay the entire purchase price for the farm; that title would be held in a land trust which would provide that the power to direct conveyances would be exercised by both Steven and Falese and in the event of Steven's death, then Hoagland would succeed to his rights and power of direction; that in the event of Falese's death that Steven would have the sole power of direction. It was further agreed that the power of direction was not to be assignable nor would it pass to the heirs, successors, executors or administrators of the beneficiaries during the lifetime of the survivor of either of them. Falese was to pay for the installation of roads, the land planning, title charges, attorneys fees and such other improvements and expenses as necessary to properly subdivide the acreage. The beneficial interest in the trust was specified as 45% for Steven, 45% for Falese and 10% for Hoagland; it was also provided that if the property were sold prior to subdivision, Steven was to first receive $128,000 with interest at 5% and the balance was to be divided between the beneficiaries as stated above. After subdivision, upon sale of a lot or lots, Steven would be paid his proportionate share of the cost of the lot sold and then Falese was to receive $600 per lot for subdivision costs and the balance was to be distributed in accordance with the above specified percentages of the three beneficiaries.

Approximately one month after the second agreement, the purchase of the Whitney Farm was closed; Steven paid the earnest money of $12,000 and an additional $58,000; however, the balance of $58,000 was financed by a note of Steven and Falese payable to Holt and Crowe. It was secured by an assignment of Steven and Falese of the beneficial interest in the land trust that would hold title to the farm. Title to the farm was conveyed to Steven and Falese and they, in turn, conveyed to Elgin National Bank as trustee under a trust agreement dated May 1, 1962, and known as Trust No. 204. The terms of the trust followed the second (March 23, 1962) agreement and the power of direction specified "R. J. Steven and Floyd Falese, or the survivor of them." A rider to the trust agreement reiterated the provisions of the second agreement covering the disbursement of any proceeds of sale between Steven, Falese and Hoagland.

By November 1, 1964, the indebtedness to Holt and Crowe had been

reduced to $43,500 by virtue of payments made by Steven. In order to secure an additional $12,000, Steven and Falese executed a new note for $55,500 dated November 1, 1964, and a new assignment of their beneficial interest in the Elgin National Bank Trust No. 204. This assignment provided that Holt and Crowe, the owners of the note, were to be paid $1,000 per acre for the partial release of land from the trust. The additional $12,000 secured by this refinancing was paid to Hoagland, who remained a beneficiary of the land trust until October 10, 1968, when he released all of his interest in the Whitney Farm; he is not involved in this litigation.

On September 1, 1965, Steven and Falese refinanced the Whitney Farm indebtedness for the second time in order to obtain an additional $25,000. A new note evidencing the indebtedness, now in the sum of $80,500, was signed by Steven and Falese; it was secured by the previous assignment of the beneficial interest in the Elgin National Bank Trust No. 204. In addition to the terms of payment, this note provided that Steven and Falese would take appropriate steps to subdivide and plat the property into lots not exceeding 1 acre; Crowe and Holt as owners of the note agreed to direct the partial release for lots from the land trust upon payment of $1,500 per acre. Two checks were issued representing the additional funds secured by this second refinancing; one check was payable to Falese individually in the amount of $23,674.14 and was endorsed by him with the language, "Payment of joint account, oil loan"; the second check was also payable to Falese in the amount of $1,325.86 and was endorsed by him and deposited in the account of the Falese Investment Company.

On March 3, 1966, Steven, Falese, Crowe and Holt directed a letter to Elgin National Bank as trustee under Trust No. 204 changing the previous terms governing the release or conveyance of lots out of the land trust. The new agreement provided that, as long as Holt and Crowe retained their security interest, the trustee was directed to convey lots on a per lot basis to Falese or his nominee upon the presentation of certified checks by Falese or the land company in the sum of $800 payable to Holt and Crowe and in the sum of $800 to Steven; it further provided that after Holt and Crowe released their security interest in the land trust, then the trustee was directed to convey lots on a per lot basis to Falese or his nominee upon the presentation of a certified check by Falese or the land company in the sum of $1,000 payable to Steven. Attached to this letter was an undated agreement signed by Steven and Falese as obligors on the September 1, 1965, note for $80,500 and signed by Holt and Crowe as the holders of said note and the assignees of the security interest in the land trust; this agreement set forth the same terms as the March 3, 1966, letter to Elgin National Bank as trustee. Also, attached to the undated

agreement was a plat of survey showing a subdivision of the Whitney Farm.

A land planner hired by Falese prepared a subdivision plat of the Whitney Farm showing 285 lots; approximately one third of these lots were actually improved and platted of record; hence approximately two thirds of the farm is still raw acreage. The land company contracted and paid for the subdivision improvements that were made; it likewise participated in the sale of the lots that were platted. Subsequent to March 3, 1966, and prior to the death of Falese, approximately 55 lots were sold; since then, some lots were sold; however, other sales were frustrated because the parties were unable to agree upon the disbursement of the proceeds of sale. Since Falese's death the president of the land company stated that the company was not going to pay for developing and subdividing the balance of the raw acreage; Falese's widow has taken the same position. The acreage has been listed for sale on occasion but has not been sold.

This litigation began on October 5, 1970, when Steven filed three claims against the estate seeking $188,566.07 for alleged payments of principal and interest on the notes due Holt and Crowe and for his share of the proceeds of sale from Whitney Farm lots. On November 24, 1971, Steven filed a chancery action against the land company based upon the Whitney Farm agreements. On motion of the land company, the estate claims and the chancery proceeding were consolidated; neither Steven nor the estate made objection thereto. The land company filed an answer to the complaint and both defendants filed a counterclaim against Steven. The first count of the counterclaim prayed for an accounting and a judgment against Steven for sums received by him in excess to the monies he was entitled; a second count sought recovery on behalf of the estate against Steven on a note dated March 2, 1966, for $2,415. Steven's answer to the counterclaim denied defendants' right to an accounting and denied that he executed the alleged note. A second counterclaim was filed later by the defendants seeking specific performance of the Steven-Falese agreements and praying that Steven be directed to execute directions for conveyances of lots from the Elgin National Bank land trust upon payment of $1,000 per lot. It further prayed for an accounting and the assessment of actual and punitive damages against Steven for breach of agreement.

As previously stated, parts of the Whitney Farm had been subdivided and sold prior to the death of Falese; however, according to the trust agreement after Falese's death only Steven was authorized to direct conveyances out of the trust. The estate and the land company filed a petition in these proceedings on two occasions seeking permission to sell lots and for an order requiring Steven to direct conveyances of lots out of the land trust. At the urging of the trial court, an oral stipulation was

reached by the parties permitting the sale of certain lots with the deposit of the proceeds in escrow. After Steven executed a direction, two lots were released by the trustee but the defendants refused to put the proceeds in escrow. Thereafter, Steven refused to release any additional lots and the court denied the petitions of the defendants seeking conveyances as they refused to escrow the proceeds, pending the outcome of this litigation.

The judgment order of the trial court determined that the various agreements between Steven and Falese described above should be construed together so that the later agreements only modified the prior agreements to the extent specifically provided therein; it held that the agreement of March 3, 1966, changed only the per lot payment to Steven until such time as he had recovered his investment. The trial court further found that the land company adopted, ratified and assumed all of the Steven-Falese agreements and therefore it was obligated to perform the agreements of Falese to subdivide and improve the remainder of the raw acreage of the Whitney Farm; it also found that the land company had breached the contract by its failure to subdivide and develop the remainder of the land and that Steven was accordingly entitled to damages therefor. The order also found that Steven was entitled to an accounting from the estate and the land company for all monies received from lot sales and for damages based on the court's construction and interpretation of the agreements as set forth above. Lastly, the court denied the relief prayed in the various counterclaims filed by the estate and the land company including the count based upon the purported note of Steven, dated March 2, 1966, for $2,415.

The trial court made no decision on the three claims filed by Steven against the estate; also the actual accounting between the parties and the assessment of damages to which Steven was entitled for the breach of the agreements was to be determined at a subsequent hearing. On motion of the defendants, the judgment order was amended to include a finding that there is no just reason for delaying the appeal. This appeal is perfected from this judgment order as amended.

After careful review of the pleadings, the record and the briefs submitted by the parties, this court has determined that the order of the trial court should be affirmed, except as to the finding on the counterclaim based on the $2,415 note. The various grounds for reversal set forth by the defendants will be considered hereafter along with the evidence pertaining to count II of the counterclaim.

■■ ■ First, the defendants contend that the court did not have chancery jurisdiction in this matter as there was an adequate remedy at law; that the complaint failed to allege the lack of an adequate remedy at

law; that Steven might have brought a declaratory judgment action to determine the rights and obligations of the parties under the various agreements; that, at best, Steven might have a claim against the estate for alleged breach of contract. This argument fails for several reasons. Falese never questioned the jurisdiction of the chancery court and, in fact, defendants sought equitable relief by filing a counterclaim for an accounting and for specific performance of the agreements in question. A party that invokes the equitable jurisdiction of the court is in no position to object thereto on appeal. (*Clemmer v. Drovers' National Bank* (1895), 157 Ill. 206, 217.) Furthermore, the subject matter of this litigation involved an Illinois land trust wherein there was a dispute between the beneficiaries in reference to their obligations and the disbursement of funds arising out of the sale of the res. Such a dispute affords a further ground for chancery jurisdiction in this case. *Regas v. Danigeles* (1964), 54 Ill. App. 2d 271.

■■■ Second, defendants contend that Steven is not entitled to relief by reason of laches. This theory is based on Steven's eight-year delay in asserting his claims. Although the first agreement between Steven and Falese was made in 1962, it is noted that over four years went by before the first lots were improved and subdivided by Falese; no lots were sold prior to 1966. Accordingly, the delay in seeking an accounting was four years rather than eight and was no longer than the delay of Falese in subdividing a portion of the farm. Furthermore, the alleged breach of the agreement by the defendants was not known until the death of Falese, when the estate and the land company took the position that there was no plan or intention to develop the remainder of the raw acreage. In this time sequence, it is obvious that Steven had not slept on his rights before instituting the present litigation. Furthermore, Falese did not raise the defense of laches in his answer or by way of affirmative defense but raises this issue for the first time on appeal; this is too late. See *Bowman v. Pettersen* (1951), 410 Ill. 519, 532, and also *Spalding v. Macomb & Western Illinois Ry. Co.* (1907), 225 Ill. 585.

Defendants next contend that the trial court erred in finding that the land company had adopted, ratified and assumed all of the Steven-Falese agreements and was bound by the same obligations as Falese. In discussing this contention, it is necessary to state certain additional facts. It is undisputed that the land company paid the development costs, advertised, sold lots and generally assumed and performed many of the obligations of Falese in the development of the Whitney Farm. Since Falese's death, the Whitney Farm was shown as an asset on the books of the land company; as previously stated it was treated by Falese as a subchapter S corporation for income tax purposes and all of the stock was

owned by him during his lifetime. The agreement of March 3, 1966, permitted Falese *or* the land company to direct conveyances out of the trust.

The trial court's finding that Falese and the land company were both responsible under the Steven-Falese agreements is further supported by certain actions of the executrix. She filed a petition in the estate proceedings seeking authority for the land company to take an assignment of the beneficial interest in the trust and also to direct the Elgin National Bank as trustee to convey lots. This petition stated that the land company had paid all subdivision expenses; it showed the land as an asset, and it further alleged that Falese was the land company's agent. Pursuant to this petition, an order was entered granting the executrix authority to execute an assignment of the Falese beneficial interest to the land company. Approximately two years later, the executrix filed an amended petition in the estate proceedings requesting that the prior order be set aside and that the probate judge enter an order that Falese dealt with Steven only in his individual capacity. Plaintiff was not given notice of any of these proceedings in the estate matter.

■■■ The foregoing undisputed evidence gave the trial judge ample basis for determining that Falese and the land company were to be regarded as one and that the land company had ratified and adopted the obligations of Falese under the agreements with Steven. The fact that the land company was organized after the date of the first agreement between Steven and Falese does not prohibit the land company from ratifying and adopting Falese's agreements. (*Reichwald v. Commercial Hotel Co.* (1883), 106 Ill. 439; *Perry v. Nevin Hotel Co.* (1952), 349 Ill. App. 22, 34.) Certainly the land company accepted many of the benefits from the agreements Falese made with Steven, such as recording each sale as income and deducting certain of the selling expenses, paying for and showing development costs as an asset on the books of the company.

■■ Apart from the evidence as to the dealings of the parties and the land company, the pleadings indicate that the land company sued for specific performance and for an accounting on the basis of the Steven-Falese agreements. Certainly it would have no standing to bring such a lawsuit if it had not adopted or ratified the agreements which it sought to enforce in this litigation. *Restatement (Second) of Agency* §97 (1958).

Further, the argument of the defendant, that the trial court "pierced the corporate veil" of the land company, is not applicable to the facts presented. Here, the trial court held the corporation liable because the corporation had ratified and assumed the obligation in the agreements made by an individual, Falese. This situation is exactly opposite to a case where the corporate veil is pierced; that occurs when an individual is

found to be personally liable for the acts or transactions of a corporation.

■■ Defendants next contend that Steven breached the agreements by refusing to direct the conveyance of lots after Falese died and that this entitled the defendants to damages and, at the very least, relieved them from going forward with the development of the remaining raw acreage. Defendants further claim that the court erred by refusing to direct conveyances pursuant to their petition which offered court supervised conveyance and sale of lots with provisions for putting the funds in escrow. Steven counters by showing that he did direct the sale of a total of 14 lots after Falese's death and that the last 2 lots were conveyed on the basis of an oral stipulation of the parties to escrow the proceeds which defendants later refused to honor. Steven further states that conveyances were directed by him for 2½ years after Falese's death and up to the time it definitely appeared that defendants were not going to develop the raw acreage according to the agreements. We find that the trial judge had ample basis to find that Steven did not breach the agreement by refusing to direct the conveyance of lots under the circumstances shown by the record.

Defendants next argue that the trial court failed to establish the rights and duties of the contracting parties and, accordingly, there is no basis for an accounting; that the relationship between Steven and Falese was that of joint venturers; that the March 3, 1966, agreement superceded all the previous agreements and, therefore, it exclusively governed all the rights and duties of the parties. Examination of the judgment order refutes these points. The trial court clearly ruled that the agreements must be construed together and that the March 3, 1966, agreement was not complete standing alone; that it only changed the method of payment to Steven for recovery of his original investment. The judgment order further found that all the other basic terms of the earlier agreements remained the same including defendants' obligation to develop and subdivide at their expense. The trial court found that the March 3, 1966, agreement was incomplete standing alone and that neither the circumstances nor the actions of the parties up to Falese's death indicated that there should be a different construction.

This interpretation is consistent with the general structure of the Whitney Farm venture as reflected by all of the agreements, namely, that Steven would put up $128,000 to acquire the farm and Falese would develop and subdivide the land; from the proceeds of sale, Steven's investment was to be returned and Falese was to receive $600 per lot for his development expenses; the balance was to be split equally. The acts and dealings of the parties consistently conformed to this framework; the alterations or changes in the agreements were occasioned by the

additional financial requirements of either Steven or Falese. The trial court's construction of the agreements is consistent with the language employed, the actions of the parties and the facts in the record.

■■ The defendants assert that the relationship between Steven and Falese was that of joint venturers and that Falese's death terminated the relationship. We cannot agree with this assertion because it is apparent that Steven and Falese contemplated the continuance of this real estate venture in spite of the death of either party, as the trust agreement provided for the exercise of the power of direction by the survivor in the event either should die. Furthermore, the trust agreement and the Steven-Falese agreements clearly indicate that the development of the Whitney Farm contemplated a life of a least 20 years or the development and sale of the entire farm whichever event occurred first.

Defendants argue that the trial court's ruling that the land company breached the agreements is against the manifest weight of the evidence. To support their position, defendants state that no evidence was presented in reference to the time required to develop the Whitney Farm; that time was not of the essence of the agreements, and that Steven should be estopped from asserting a breach as his refusal to convey the lots already available was justification for the refusal of the defendants to develop the remaining lots.

■■ The record here reveals that in a period of 11 years, Falese had developed only about one-third of the number of lots intended; that the successors of Falese, namely, the estate and the land company president, stated that there was no intention by either of them to develop the remainder of the raw acreage; they had been in possession thereof for three years after Falese's death without making any attempt to further subdivide the farm. The appellate court will not disturb the finding of the trial court unless the findings are against the manifest weight of the evidence. (*Schulenburg v. Signatrol, Inc.* (1967), 37 Ill. 2d 352.) The foregoing facts provide adequate basis for the conclusion of the trial court that the agreements had been breached by Falese and his successors.

Defendants complain because additional hearings will be required to decide the issues raised by (1) the actual accounting between Steven and the defendants; (2) the assessment of damages against the defendants for breach of the Steven-Falese agreements; (3) the three claims of Steven filed against the estate. The ordering portion of the judgment order of December 20, 1974, in part, stated as follows:

> "3. That the defendant, the Falese Land Company, has wholly failed to subdivide and improve the land in question in this lawsuit into a subdivision containing approximately 300 lots as it promised to do in its contract and has therefore breached its contract, and, it is further ordered, adjudged and decreed that the plaintiff, R. J.

Steven, is entitled to recovery and and all damages suffered by him as a result of the aforesaid breach of his contract with the defendant, the Falese Land Company, and that the defendant Falese Land Company is hereby ordered to account to the plaintiff, R. J. Steven, for all monies received from the sale of lots therefrom in accordance with the contract between the parties.

4. It is further ordered, adjudged and decreed that the question of plaintiff's damages is hereby reserved until after the accounting ordered herein as is the question of whether the land involved should be sold at a public sale as prayed in the complaint and all other prayers for relief not specifically disposed of in this order.

\* \* \*

7. That this Judgment Order is limited solely to Cause No. 71-CH-11956 and the court makes no order at this time in connection with the proceedings on the claims filed by R. J. Steven, claimant, against the estate of Floyd Falese in cause #70-P-3369."

■■ In the trial court, defendants jealously maintained that the right to account must first be determined before any evidence could be heard on the actual accounting phase of this case. The trial court agreed and sustained defendants' objections to plaintiff's attempt to secure the land company's books and records for accounting purposes. In view of the position taken by the defendants in the trial court in reference to the accounting phase of this case, defendants cannot at this time complain that further hearings will be necessary in this case to effectuate the accounting between the parties.

Defendants also contend that the court had no right to sever the issue of liability from the damage issue citing *Mason v. Dunn* (1972), 6 Ill. App. 3d 448. This was a personal injury case tried before a jury in which the issue of liability and damages were separated over the objection of the defendant. On appeal, this court held that the trial court had no authority to sever the issues of liability and damages in a single action.

Referring to the record here, we find that the trial judge orally announced his decision on November 8, 1974, at which time he stated, relative to the damage issue, as follows: "\* \* \* with regard to damages on which there's been basically no proof on whatsoever." "\* \* \* and keeping in mind that we've heard no proof of damages or anything of that sort."

On December 20, 1974, the court held a hearing on the proposed judgment order submitted by Steven; paragraph 7 of this proposed order provided as follows: "That the court reserves the question of damages until after an accounting is made."

Defendants filed written objections to the proposed judgment order and, as to paragraph 7 thereof, the objection stated that it was contrary to

the court's findings as there was no express reservation of the damage question at the time the court gave its oral decision in this case and the objections further quoted the above language of the court to the effect that no proof on the damage issue had been heard. Defendants made no request at that time to proceed with hearings on the question of damages, nor did they object to that portion of the order which reserved the assessment of damages until after the accounting phase of the case.

■■ In view of the defendants' failure to make any objection to the reservation of the damage issue, we hold that defendants cannot raise this point on appeal and that the case of *Mason v. Dunn* (1972), 6 Ill. App. 3d 448, is clearly distinguishable as the defendants in the latter case immediately and continually asserted their opposition to the bifurcation of the liability and damage issues. Furthermore, we again note that the defendants amended the judgment order in this cause to make it appealable, and having done so they cannot at this point complain that the lower court erred in bifurcating certain issues to be tried in this case.

Defendants also cite the case of *Clements v. Schless Construction Co.* (1967), 91 Ill. App. 2d 19, claiming that the bifurcation discussed above deprived them of the "intrinsic fairness of procedure" required by due process; this case involved a personal injury trial wherein a third-party defendant was permitted, over plaintiff's objection, to participate in the trial in the principal action; it is therefore in no way analogous to the proceedings in this case.

■■ Defendants also could have requested the trial court to decide the three claims that Steven filed against the estate prior to taking this appeal. Neither of the defendants saw fit to do so although the judgment order specifically provided that it has no connection with these matters. If the trial court committed error by its failure to decide the three claims prior to this appeal, defendants again are not in the position to press this point, as it was the defendants that made the motion to amend the judgment order to include the appealability language.

Defendants claim that Falese was only an accommodation maker on the notes described in the three claims Steven filed against the estate; that more than five years had elapsed since the notes were executed and, therefore, suit on the notes is barred by the statute of limitations. The trial court did not render any decision in reference to the estate claims of Steven as previously discussed, and hence there is no final order in reference thereto. Accordingly defendants may assert this defense at such times as hearings are held and rulings are made upon remand of this cause.

One of the counts in the counterclaim filed by the estate alleged that Steven, on March 2, 1966, executed his demand note payable to Falese in the sum of $2,415, and it prayed judgment for said amount. The original of

this note was never produced at the trial; however, the president of the land company testified that the original note was inadvertently lost during preparation for this case, but it had been photocopied for use in these proceedings and such a photocopy was admitted in evidence by stipulation. At the trial, the signature on the photocopy of this note was identified by Holt as being that of Steven. The estate presented evidence that showed Falese wrote check No. 432 in the sum of $2,415, on March 2, 1966, payable to Steven; that this sum was deducted from Falese's checking account on March 5, 1966; that check No. 4327 was endorsed by Steven, Holt and Elgin National Bank; that on March 1, 1966, an interest payment in the amount of $2,415 was due Holt and Crowe by Steven and Falese; that on March 1, 1966, the bank account maintained by Steven was overdrawn. The proof further showed a photocopy of Falese's check stub for No. 4327 marked "Doc Steven's Loan."

Steven, by his sworn answer to the counterclaim, denied the execution of this note; he did not testify at the trial as he was prohibited from doing so by reason of the Dead Man's Act (Ill. Rev. Stat. 1975, ch. 51, par. 2). There was no evidence that Falese during his lifetime ever made a demand on Steven for payment; the note was never inventoried in the estate nor shown in the inheritance tax or estate tax returns of the executrix.

The trial judge stated that the "pedigree" of the note was suspect, particularly in view of the denial of Steven and the absence of a demand by Falese. Accordingly, the trial judge denied the relief prayed in this count of the counterclaim. Defendants now contend this finding is against the manifest weight of the evidence.

■■ Defendants' evidence established a *prima facie* case by showing (1) that the original note was lost; (2) that the signature on the photocopy of the note was that of Steven; (3) that Steven endorsed a check in the amount of the note on or about the date thereof; (4) that an interest payment in that amount was due about that time; and (5) that Steven's bank account was overdrawn on that date. The evidence of Steven consisted of a denial under oath that he had executed the note and that the estate had not shown the note as an asset; there was no evidence that a demand for payment had even been made by Falese or on his behalf.

The law applicable to this state of the record was set forth in *Telpner v. Hogan* (1974), 17 Ill. App. 3d 152,157-58:

> Plantiff proceeded with the trial as to the eight notes, relying on the provisions of the Uniform Commercial Code (Ill. Rev. Stat. 1971, ch. 26, par. 1—101 *et seq.*). Section 3—307(2) of the Uniform Commercial Code provides that:
>
>> 'When signatures are admitted or established, production

of the instrument entitles a holder to recover on it unless the defendant establishes a defense.' Ill. Rev. Stat. 1971, ch. 26, par. 3—307(2).)

The official Uniform Commercial Code comment explains that, under this section:

'Once signatures are proved or admitted, a holder makes out his case by mere production of the instrument, and is entitled to recover in the absence of any further evidence. The defendant has the burden of establishing any and all defenses, not only in the first instance but by a preponderance of the total evidence.' "

There the court was considering the defense of discharge on certain notes. In that case, the plaintiff was the executrix of a decedent's estate, and, as in the instant case, had failed to inventory the indebtedness arising from the note. The court, in *Telpner v. Hogan* (1974), 17 Ill. App. 3d 152, 161, further stated as follows:

"Thus, our supreme court there did not hold that an inventory is conclusive evidence of the property owned by a decedent at his death as defendant urges, but, rather, an inventory is competent evidence having some probative value when used to corroborate other substantial evidence of the property owned at decedent's death."

On the basis of the principles set forth above, and viewing the evidence of this case as a whole, we agree with the defendants that Steven failed to overcome the *prima facie* case made out by the defendants, and for the above reason the judgment of the trial court is reversed as to count II of the counterclaim.

■■ Finally, the defendants assert that the delay between the end of the trial and the court's decision confused the result and failed to resolve the controversies between the parties. They assert that findings of fact and conclusions of law were necessary and were not made by the trial judge. Again referring to the record, we find that defendants never made any request or demand of this nature in the trial court, and for that reason they are not in a position to complain in this regard.

Accordingly, the judgment of the trial court is affirmed except as to count II of the counterclaim and as to that count, the judgment of the trial court is reversed with instructions to enter judgment in favor of the estate. Accordingly, this case is remanded for further proceeding as provided in this opinion.

Affirmed in part and reversed in part and remanded.

GUILD and NASH, JJ., concur.