HOWARD A. KOOP & ASSOCIATES *et al.*, Plaintiffs-Appellees and Cross-Appellants, *v.* KPK CORPORATION *et al.*, Defendants-Appellants and Cross-Appellees.

Second District   No. 82—615

Opinion filed November 3, 1983.

Philip C. Ruddy and James D. Skaar, both of Ruddy, Myler, Ruddy & Fabian, of Aurora, for appellants.

Wendell W. Clancy and Gary V. Johnson, both of Clancy, McGuirk & Hulce, of St. Charles, for appellees.

JUSTICE HOPF delivered the opinion of the court:

Following a bench trial, plaintiff Howard A. Koop (Koop) and defendants KPK Corporation (KPK), Seattle Steam Corporation (Seattle), Buskirk Lumber Company (Buskirk), and Robert L. Brumley (Brumley), appeal from various portions of a Kane County circuit court judgment awarding $46,200 to plaintiff and $49,000 to defendant KPK, pursuant to various contractual agreements between the parties.

The facts surrounding this controversy are as follows. On July 6, 1977, defendant Brumley entered into a purchase agreement with KPK to acquire two-thirds of the then outstanding stock in KPK Corporation. Plaintiff Koop was at that time one-third shareholder, as well as the president and chief operating officer of KPK. On July 15, 1977, KPK entered into a buy-sell agreement with its two shareholders, Brumley and Koop, whereby either stockholder had first option to acquire the shares of the other. Koop continued as president of KPK until March 9, 1978, when he entered into a stock redemption agreement with KPK. Brumley thereafter acquired all of Koop's outstanding shares, thus becoming the sole shareholder in KPK Corporation.

As consideration for Koop's sale of the stock, Koop received a total of $400,000, some bank stock in the Batavia Investment Company, a car, and some incentives in the form of various contractual agreements which are the subject of this appeal. Among these agreements were certain employment contracts between Koop, Seattle and Buskirk, whereby Koop agreed to act as special assistant to the president of those corporations (Brumley). Seattle and Buskirk were both wholly owned subsidiaries of KPK. Seattle agreed to pay Koop $1,650 per month for his services, plus $50 per month toward the cost of a leased business automobile. Buskirk agreed to pay Koop $4,200 per month salary, plus $200 per month toward the leased automobile. Both of these contracts provided that in the event either party wished to terminate their respective contracts, then 30 days' written notice was required.

In addition to the employment agreements, Koop also entered into a written "Agreement to Negotiate Sale or Lease" with KPK, whereby Koop was entitled to a commission if he could procure a purchaser or tenant for a building owned by KPK, known as "Building 48," prior to July 1, 1979. The particulars of this agreement are discussed later in this opinion.

On May 12, 1978, Koop procured a tenant, Lifetime Foam Company, for Building 48, and the lease was subsequently executed on June 22, 1978. On July 28, 1978, Koop wrote KPK requesting $47,198 for his procurement of the tenant for Building 48. Attached to this letter was a detailed computation of this amount which had been prepared by Joseph Liss, a certified public accountant (CPA) and former treasurer of KPK.

Meanwhile, on July 1, 1978, Seattle and Buskirk notified Koop that his employment with them was terminated. On July 28, 1978, the same date as Koop's letter requesting his procurement fee, Koop demanded wages and expenses for the month of July 1978 which he claimed were due him under the employment agreements with Seattle and Buskirk. KPK responded by letter dated August 23, 1978, advising Koop that the corporations were claiming a setoff of $7,219.76 owed by Koop to KPK for prior loans and from an overpayment of Koop's salary. The matter was referred to Koop's attorney, who advised KPK that its actions in this regard were in violation of an oral agreement to forgive these debts, which were allegedly made at the closing of the stock sale.

Plaintiff Koop ultimately brought this action against defendants to recover commissions, salaries, and other benefits allegedly due him under the various contracts, as well as attorney fees incurred in connection with the employment contracts. At the time of filing his complaint, Koop also obtained a temporary restraining order and later a preliminary injunction preventing KPK, Brumley and the New York Life Insurance Company from cancelling five New York Life Insurance policies owned by KPK on the life of Koop. Koop alleged that KPK had orally agreed to assign the policies to him, but then failed to do so. In response to Koop's complaint, defendants filed an affirmative defense and counterclaim seeking to offset any amounts due to Koop by monies which Koop allegedly owed to KPK, Seattle and Buskirk. Defendants also alleged that Koop made false representations to Brumley regarding KPK's financial condition when Brumley first acquired the two-thirds interest in KPK in 1977, and again when he acquired Koop's shares in March 1978. Finally, defendants sought reimbursement of the insurance premiums which KPK was required to pay under the restraining order obtained by Koop and denied any oral agreement to assign the policies to Koop.

After hearing evidence and arguments of counsel, the circuit court found that: Koop was entitled to a commission in the amount of $40,100 from KPK under the agreement to negotiate sale or lease; Koop was entitled to one month's salary plus expenses from Seattle

and Buskirk; certain debts owed by Koop to KPK and Buskirk were not forgiven at the time Koop sold his stock to KPK and Brumley; Koop did not fraudulently misrepresent the condition of KPK to Brumley; there was no oral agreement to assign the life insurance policies to Koop; KPK was entitled to reimbursement from Koop for insurance premiums it was required to pay pursuant to the preliminary injunction; and Koop was not entitled to recover attorney fees in connection with his claim against Seattle and Buskirk. Defendants appeal from the court's findings on the commission and misrepresentation issues. They also allege that the court erroneously failed to rule on their counterclaim for an offsetting of amounts due to Koop by debts which Koop owed to them. Koop appeals from the court's findings on the issues of forgiveness of debts, life insurance assignment, and attorney fees.

We first consider defendants' contention that the trial court erred when it determined that Koop was entitled to a commission under the "Agreement to Negotiate Sale or Lease" of Building 48. The agreement provides in pertinent part:

"(b) If a tenant for Building No. 48 shall be procured (either through the efforts of KOOP or through the efforts of a third party) on or before May 15, 1978 and if the *annual net rent* to be realized by KPK under such lease, when capitalized at ten percent (10%), would produce a *net gain* (*as defined above*) of Five Hundred Thousand Dollars ($500,000), then and in such event KPK shall pay to KOOP the sum of Fifty Thousand Dollars ($50,000); ***."

The agreement also provides that Koop would in no event be entitled to a fee in excess of $50,000, and that if the net gain to KPK under such sale or lease is less than $500,000 then Koop's fee would be reduced pro rata at the rate of $12,500 for each reduction of $100,000 in gain (or 12.5%). "Net gain" is defined in the agreement as "sale price *less* basis." The agreement does not define "net rent," "sale price," or "basis." The parties apparently agree, however, that "sale price" under the contract here is equal to the average annual rental income of the property, capitalized at 10%. Thus, the formula for computing "net gain" and, ultimately, Koop's commission under the agreement may be simply summarized in the following equations:

Net gain = (annual net rental income, capitalized @ 10%)-basis

Fee = $50,000-[($500,000-net gain) x 12½%].

The parties do not dispute that Koop did in fact procure a tenant, Lifetime Foam Products, Inc. (Lifetime), prior to the May 15, 1978, deadline in the above-quoted provision. It is also undisputed that un-

der the lease, Lifetime is to pay a total aggregate rent of $3,747,558.08 over 15 years' time, or an average annual rent of $249,837.20. The dispute here, however, focuses upon the proper determination of "net annual rent" and "basis" in the above formula for computation of "net gain."

In a letter to Brumley and KPK, dated July 28, 1978, Koop requested payment of $47,198 in commissions allegedly due under the contract. These calculations were prepared by Joseph Liss, a CPA and former treasurer of KPK. At trial Liss revised his calculations and testified that the total fee due Koop was $40,100 instead of $47,198. In arriving at this figure, Liss first computed "net gain" under the contract by taking the average annual rental income ($249,837.20) multiplied by 10 (the capitalization rate) to arrive at a figure of $2,498,372. From this amount he deducted $2,077,572, the figure which he determined to be the "basis" of the property, as defined by the Internal Revenue Code. According to Liss, the "basis" figure was calculated by taking the book value of the property as reflected in KPK's books and deducting from this figure depreciation and other items, such as commissions and interest, which had been treated by KPK as assets for book purposes but not for income tax purposes. To this figure, Liss added the cost of certain improvements which were not yet reflected on KPK's tax forms. Among these improvements were carpentry and electrical work, hardware, carpeting and painting. However, certain expenses were not included in Liss' determination of either "basis" or "net rental income." Among the excluded expenses were repairs presently being done by KPK to the roof, smoke vents, and plumbing system of Building 48.

At trial, Liss testified that he was not aware of any other definition or method of computing "basis" under generally accepted accounting principles. He also testified that his method of capitalizing annual rental income was in accordance with the method used by the mortgage banking industry in connection with leases. Liss stated that his method of computation was consistent with the policies of KPK and was in accordance with KPK's tax returns. It was revealed at trial that Liss' employment with KPK terminated in June 1978; however, he testified he prepared the computation at Koop's request while he was still employed at KPK and had access to its books. Upon leaving KPK, Liss began his own accounting practice in a building which he owned with Koop.

Defendants claim that Koop is entitled to no fee under the contract and that Liss improperly determined "net gain." They claim that the annual rental income utilized by Liss was a gross figure and

not a net figure, as required by the contract. Thus, they reason the annual net rental income should reflect expenses required to be paid by KPK under the lease. Defendants further claim that Liss improperly relied upon the IRS' definition of "basis" in computing "net gain," and that the term "basis" under generally accepted accounting principles means the book value of the property as reflected in the books of the company. Defendants offered the testimony of three experts to support their position. Steven Glibkowski, controller for KPK at the time of trial, testified that Liss used an arbitrary method of capitalizing rents and deviated from KPK's method of using present value to capitalize rents. Glibkowski stated that although he was aware of no writing by any accounting body which equates "basis" with book value, "everyone I have talked to when I mention the word basis, the first thing they say is book ***." Edwin Sigel, a CPA and accountant for KPK, agreed that book cost was the proper method of determining "basis." In the past Sigel worked for the Internal Revenue Service for approximately nine years, and testified that the books of some corporate taxpayers were not maintained in accordance with generally accepted accounting principles. He testified that those taxpayers were not violating the law. James Friedlieb, a CPA and graduate of Wharton Business School, testified that under the agreement the "net annual rentals" would be equal to the gross rentals, as determined by Liss, less the expenses of repairs and real estate taxes which KPK was required to pay under the initial period of the lease. According to Friedlieb, the "net annual rental" is therefore $243,832, and not $249,837.20 as calculated by Liss. He determined the capitalized net annual rent to be $2,438,323. To determine "basis," Friedlieb took the book value of the property and added to that figure certain capital improvements which were also considered by Liss and added in Liss' computation of "basis." However, Friedlieb did not reduce this figure by tax deductible items, as did Liss. Thus, Friedlieb calculated the "basis" to be $2,366,244, which was $288,672 higher than Liss' determination of "basis." Accordingly Friedlieb determined Koop was entitled to no fee under the contract. Friedlieb's calculations are summarized as follows:

Net gain = $2,438,323 (capitalized rents) - $2,366,244 (basis) = $72,079

Fee = $50,000 - [($500,000 - $72,079) x 12½%]

Fee Deficiency = $3,490.13.

In arriving at his calculations, Friedlieb did not examine the books of KPK to determine how they were kept prior to March 9, 1978. He also stated there were other ways of determining "basis" other than

on the books and records of the corporation. Finally, defendant Brumley testified he was aware prior to March 9, 1978, that KPK's financial statements were not totally in accordance with generally accepted accounting principles.

■ Initially, defendants claim that because the evidence consists mainly of documents, this court is not bound by the trial court's findings and may make an independent decision on the facts. (See *National Boulevard Bank v. Citizens Utilities Co.* (1982), 107 Ill. App. 3d 992, 438 N.E.2d 471; *Carlson v. Carlson* (1979), 74 Ill. App. 3d 673, 393 N.E.2d 643.) However, after stating this principle defendants rely primarily upon the testimony of their expert witnesses and not upon the documents themselves. While defendants correctly state this principle of law, the principle is inapplicable where extrinsic evidence is introduced to aid in interpreting a contract. (See *Chicago Principals Association v. Board of Education* (1980), 84 Ill. App. 3d 1095, 1099, 406 N.E.2d 82; *Standard Steel & Wire Corp. v. Chicago Capital Corp.* (1975), 26 Ill. App. 3d 915, 920, 326 N.E.2d 33.) Under these circumstances, the meaning of the language in the contract is a question for the trier of fact, whose determination will not be reversed unless it is contrary to the manifest weight of the evidence. *Chicago Principals Association.*

■■ ■ In the instant case, the terms "basis" and "net annual rent" were not defined in the contract. Thus, extrinsic evidence was properly introduced to ascertain the true intent of the parties with respect to these terms. (*Chicago Principals Association v. Board of Education* (1980), 84 Ill. App. 3d 1095, 1099, 406 N.E.2d 82.) The trial court concluded after hearing all the evidence that the parties intended the term "basis" to refer to the amount reflected on the tax returns of KPK. This finding is not against the manifest weight of the evidence. The evidence indicated that "basis" could be computed in several ways, and that although this definition did not follow generally accepted accounting principles, the method used by Liss was not in violation of the law and was, according to Liss, consistent with the policies of KPK in making similar computations in the past. This evidence was not rebutted by defendants. Further, Brumley indicated he was aware prior to March 9, 1978, that KPK, Seattle, and Buskirk did not always follow generally accepted accounting principles. The lease agreement in question was drafted by defendants' attorneys and, therefore, could have contained a definition of the terms in question. Any ambiguity in the language of the contract should be resolved against KPK, the drafter of the document. *Sanni, Inc. v. Fiocchi* (1982), 111 Ill. App. 3d 234, 443 N.E.2d 1108.

■ With respect to the meaning of "net annual rent," we agree with defendants that Liss' calculations were in error. Liss testified his computations were in accordance with KPK's past method of capitalizing rents and were in accordance with the mortgage banking industry's standards. However, Liss' computation of "annual net rentals" did not take into account any expenses resulting from repairs to the building or payment of real estate taxes, both of which KPK was indisputedly required to pay under the terms of the lease. The term "net" is understood to mean that which is "[r]emaining after all necessary deductions have been made or all losses accounted for." (American Heritage Dictionary of the English Language 882 (1960).) Black's Law Dictionary 1192 (rev. 4th ed. 1968) defines "net income" as "[a]mount remaining after proper current charges have been made against gross income." Thus, implicit in the definition of "net income" is the deduction of certain amounts from an initial sum. On appeal Koop contends that rather than subtracting certain expenses from the gross annual rental income to arrive at the net income figure, Liss added these same expenses to the "basis" of Building 48, thereby achieving the same result. However, the record does not support Koop's position. While certain improvements were added to the book value to arrive at the "basis," neither repairs nor real estate taxes were considered in Liss' computations. In fact, the expenses for repairs were expressly excluded in the calculations. Thus, it is clear that Koop's method of calculation was substantially different from that specifically called for under the contract. We therefore reverse and remand this portion of the court's order for a recomputation of the fee due to Koop under the agreement.

Next we consider the propriety of the trial court's rulings on counts III and IV of plaintiffs' complaint. Count III sought to recover wages and expenses which Koop claimed were due him under his employment contracts with Seattle and Buskirk. Count IV sought a declaration that there was an oral agreement between the parties that certain "open account debts" which Koop admittedly owed defendants would be erased and forgiven. Defendants denied the existence of such an agreement. These same "open account debts" were also the subject of defendants' affirmative defense and counterclaim to count III, in which they requested that Koop's indebtedness be offset against any amounts which defendants might owe Koop under the employment contracts. The court awarded $6,100 to Koop pursuant to count III of the complaint, and ruled in favor of defendants on count IV, thereby finding there was no agreement to forgive Koop's debts. However, no offsetting of these amounts was made by the court, and

no ruling was made nor requested by defendants on either their affirmative defense or counterclaim.

■■ Plaintiff Koop challenges the trial court's finding that there was no oral agreement to erase his indebtedness. Defendants contend that the court erred when it failed to offset Koop's indebtedness against the amounts owing to Koop under the employment contracts.

In this regard, we first consider the question whether the trial court correctly determined that there was no oral agreement to erase Koop's indebtedness. At trial, it was established that Koop did in fact owe Buskirk $1,715.17, and KPK $9,039. Plaintiff contends that part of the consideration for his sale of the stock was the forgiveness of these debts. The evidence indicates that in fact this item was discussed prior to and at the closing of the transaction on March 9, 1978. However, defendant Brumley and KPK's attorney, Donald Conley, testified that while there was some discussion of this item prior to closing it was specifically rejected by KPK and not made a part of the stock sale transaction. Mr. Conley's notes on the subject indicated that a question mark was placed in the margin alongside this item. This item was never contained in the written agreement executed on March 9, 1978.

Whether an oral contract exists, its terms and conditions, and the intent of the parties are questions of fact to be determined by the trier of fact, in this case the trial court. (*Hodgman, Inc. v. Feld* (1983), 113 Ill. App. 3d 423, 447 N.E.2d 450; *Emmenegger Construction Co. v. King* (1982), 103 Ill. App. 3d 423, 431 N.E.2d 738.) The trial court's determination in this regard should not be reversed unless it is contrary to the manifest weight of the evidence. *Dutton v. Roo-Mac, Inc.* (1981), 100 Ill. App. 3d 116, 426 N.E.2d 604.

■■ In the instant case, the trial court's determination that there was no oral contract to erase Koop's debts was supported by the testimony of both Brumley and Conley and therefore will not be reversed by this court. Although defendants admitted in their pleadings that a portion of these "open account debts" had previously been erased from the books, there is no indication that this action constituted part of the consideration given for the stock sale transaction, as Koop claims. Further, it is well established that preliminary negotiations to a contract are generally merged into the final written agreement and that agreement is presumed to include all material terms. (*World Insurance Co. v. Smith* (1975), 28 Ill. App. 3d 1022, 1025, 329 N.E.2d 518.) We think that if the forgiveness of debts were intended to be part of the consideration for the sale, it would have been included in the written documents. Accordingly, we find no error in the court's

ruling.

■ Inasmuch as the trial court properly determined that the debts owed by Koop to KPK and Buskirk were not forgiven, it is clear that defendants were entitled to offset these amounts against the sums due to Koop under the employment contracts. It also appears that the court's failure to offset the amount of the indebtedness, as requested in defendants' affirmative defense and cross-claim, was inadvertent. We recognize that defendants' failure to request a ruling on this issue would normally preclude its review on appeal. (*Steven v. Falese Land Co.* (1977), 50 Ill. App. 3d 231, 246, 365 N.E.2d 967.) However, because this case is being remanded on other grounds, and because the rights and liabilities of the parties on this issue have been fully litigated and determined, we consider this case an appropriate one in which to exercise the authority vested in us pursuant to Supreme Court Rule 366. (87 Ill. 2d R. 366; *Fure v. Sherman Hospital* (1978), 64 Ill. App. 3d 259, 263, 380 N.E.2d 1376; *cf. Pickett v. First American Savings & Loan Association* (1980), 90 Ill. App. 3d 245, 412 N.E.2d 1113.) Accordingly, we direct the trial court upon remand to enter an order offsetting Koop's indebtedness against the sums found owing to him by defendants.

■ Defendants next contend that Koop, as an officer of KPK, misrepresented the financial condition of KPK prior to the July 6, 1977, and March 9, 1978, stock sales to Brumley. Defendants list seven points in their brief which they claim Koop misrepresented to them, and on which Brumley allegedly relied in his purchase of KPK stock. After reviewing the record in this regard, we find defendants' contention to be without merit.

In the July 6, 1977, stock sales agreement between Brumley and KPK, KPK through Koop warranted that "[t]o the *best of KPK's knowledge and belief and based upon information presently available and without further investigation having been made*, the balance sheets of KPK *** for the period from June 1, 1976, to April 30, 1977, *** fairly present the financial [position] *** of KPK ***." (Emphasis added.) This provision incorporates by reference the financial statement of the company, dated April 30, 1977, which sets forth the various accounting policies and liabilities, both present and future, of KPK and its subsidiaries. At the closing date on March 9, 1978, Koop warranted in the stock redemption agreement between himself and KPK, that "to the best of his knowledge and belief there has been no substantial or material adverse change in the financial condition of KPK Corporation since June 1, 1977 that has not been communicated to *** Robert L. Brumley."

At trial, it was established that prior to the closing, Brumley's attorneys investigated the financial condition of KPK. Brumley testified that the specific liabilities which are the subject of this appeal were not listed in the financial statement. However, he indicated that several of the liabilities were discussed prior to closing, but that the amounts in question were underestimated. Without discussing in detail each liability which Brumley now claims was undisclosed, suffice it to say we have reviewed the record and find that in each case Brumley was aware of the existence of these obligations, but failed to inquire or investigate into the extent of the liabilities. Brumley was also aware of KPK's general financial difficulty and was aware that the financial statement proposed major reorganization. Certain portions of the statement provided that it was "subject to concurrence by independent certified public accountants"; however, Brumley never inquired as to the meaning of this provision and never hired an independent auditor to review the records. Note "N" of the statement provided that "[a] statement of changes in financial positions has not been prepared as required by generally accepted accounting principles." No further statement was ever requested by Brumley.

On the basis of this record, it is clear that Brumley and his attorneys were adequately apprised of the possible liabilities of KPK and its subsidiaries as of June 1, 1977, and prior to closing on March 9, 1978. It is also clear that plaintiff Koop was not guaranteeing the exact amount of KPK's liabilities, but only estimating "to the best of his belief and knowledge" KPK's projected liability in certain areas. (See *Murphy v. Walters* (1980), 87 Ill. App. 3d 415, 423, 410 N.E.2d 107.) These areas were all subject to further investigation, especially with regard to any changes between June 1977 and March 1978, but no further investigation was conducted. There is no evidence in the record that any omissions or errors in the statement were intentional, and a knowing misstatement is one of the elements necessary to prove fraudulent misrepresentation. (*Colonial Bank & Trust Co. v. Kozlowski* (1982), 106 Ill. App. 3d 639, 435 N.E.2d 1251.) As majority shareholder of the corporation contemplating the purchase of the remaining stock of the company, Brumley clearly had equal access to the books and records of KPK prior to the closing on March 9, 1978. (*Weigel v. O'Connor* (1978), 57 Ill. App. 3d 1017, 373 N.E.2d 421.) Further, Brumley had a history of dealing with KPK and was aware that the company needed an infusion of capital at the time he purchased Koop's shares of stock in March 1978. It therefore cannot be said that Koop misrepresented the financial condition of KPK.

Plaintiff Koop next contends that the trial court erred when

it determined that there was no oral agreement to assign certain life insurance policies to Koop. Alternatively, he argues that if the trial court correctly decided this issue, then its award of damages to KPK in the amount of $49,000 was speculative and not supported by the evidence.

As with plaintiff's claim regarding an oral agreement to forgive his indebtedness, plaintiff again refers to certain evidence in the record establishing that this issue was discussed prior to and at the closing on March 9, 1978. However, both defendant Brumley and his attorney, Mr. Conley, testified that no such oral agreement was reached. Because the record contains evidence which supports both parties' positions, the resolution of this question was one of fact for the trial court. (*MBL (USA) Corp. v. Diekman* (1983), 112 Ill. App. 3d 229, 235, 445 N.E.2d 418.) We therefore affirm the trial court's finding in this regard.

With respect to the proper measure of damages to be awarded to KPK, Koop claims that the court's judgment did not take into account the fact that KPK was "max loaning" to pay for at least one of the policies. Defendants maintain, however, that the evidence established that after "max loaning," KPK paid in excess of $49,000 in premiums.

The following evidence was adduced on this issue. The parties agreed to a preliminary injunctive order enjoining defendants from cancelling three New York Life Insurance policies "until such further order is entered." The ownership of the policies was to remain in the possession of KPK, and Koop was authorized to designate the beneficiaries of the policies. Koop was to pay the premiums on the policy, but if he failed to pay KPK was required to make the payments. Koop was required to reimburse KPK for any payments which KPK made on his behalf. Subsequent to the injunction, Koop allowed two of the policies to lapse.

Pat Savaiano, life insurance agent for New York Life Insurance Company, testified that KPK paid some of the premiums on the lapsed policies by "max loaning." "Max loaning" is a method of payment whereby the owner of the policy (here KPK), uses the future cash value of the policy to pay premiums. This results in essentially no cash outlay by the owner. Savaiano stated, however, that as the policy gets older there would probably be insufficient monies to use cash value as a method of premium payment. Savaiano testified that one policy had been paid by the "max loaning" method for about three years commencing around the end of 1978 or 1979. The injunction order was issued on April 4, 1979. On cross-examination, Sa-

vaiano testified that as of March 8, 1978, several of the policies in question had no cash value. Finally, Brumley testified, over plaintiff's objection, that KPK paid approximately $49,000 in premiums, and that some of those policies had a cash value.

On the basis of this record, we are unable to ascertain what amount of the premiums paid, if any, were paid by "max loaning." The evidence does not establish if the policies that were lapsed and for which premiums were paid were the same ones that had no cash value, so that "max loaning" would be impossible. Resolution of this factual question is essential in order to determine the precise amount of monies which KPK was in fact required to outlay to keep the policies in force. We further agree with plaintiff that Brumley's mere assertion that $49,000 was expended, without some degree of documentation, is insufficient to establish a proper basis from which to determine damages. (*Schoeneweis v. Herrin* (1982), 110 Ill. App. 3d 800, 808, 443 N.E.2d 36.) Thus, upon remand, further evidence should be adduced to more accurately determine the actual damages suffered by KPK.

Koop contends that under the holding in *Stocker Hinge Manufacturing Co. v. Darnel Industries, Inc.* (1983), 94 Ill. 2d 535, 447 N.E.2d 288, damages were improperly awarded because defendants agreed to the injunctive order and did not establish that the order was wrongfully granted. This claim is without merit. *Stocker* is distinguishable from the instant case. In that case, defendants requested "damages for the wrongful entry of a temporary restraining order," pursuant to sections 9 and 12 of the Injunction Act (Ill. Rev. Stat. 1977, ch. 69, pars. 9, 12). Here, however, defendants were not seeking damages for the wrongful entry of a temporary restraining order, but were seeking reimbursement from Koop for premiums which Koop was required to pay under the order. *Stocker* is therefore inapposite to the instant case.

Finally, we consider plaintiff's argument that he was improperly denied attorney fees under "An Act providing for attorney's fees when mechanic, artisan, miner, laborer or servant sues for wages" (Ill. Rev. Stat. 1981, ch. 13, par. 13), in connection with his claim for breach of his employment contracts with Seattle and Buskirk. Defendants maintain that Koop was not an "employee" within the meaning of that section. We agree.

"An Act providing for attorney's fees when mechanic, artisan, miner, laborer or servant sues for wages" (Ill. Rev. Stat. 1981, ch. 13, par. 13) provides:

"Sec. 1. Whenever a mechanic, artisan, miner, laborer, ser-

vant or employee brings suit for wages earned and due and owing according to the terms of the employment, and establishes by the decision of the court or jury that the amount for which he has brought suit is justly due and owing, and that a demand was made in writing at least 3 days before suit was brought, for a sum not exceeding the amount so found due and owing, then the court shall allow to the plaintiff a reasonable attorney fee of not less than $10, in addition to the amount found due and owing for wages, to be taxed as costs of suit."

In *Reiss v. El Bauer Chevrolet Co.* (1968), 96 Ill. App. 2d 266, 238 N.E.2d 619, relied upon by plaintiff, the court disagreed with previous cases holding that the term "employee" in the statute was limited to those "engaged in services like those of a mechanic, artisan, miner, laborer or servant." (See, *i.e., Buren v. Mercury Press, Inc.* (1935), 280 Ill. App. 217.) The *Reiss* court held that the term included "all employees who must sue to obtain payment of their wages and who otherwise comply with the requirements of the statute." (96 Ill. App. 2d 266, 271, 238 N.E.2d 619.) The court therefore concluded that two automobile salesmen could sue their employer for bonus wages. In *Lites v. Jackson* (1979), 70 Ill. App. 3d 374, 387 N.E.2d 1118, the court limited the holding in *Reiss* to its facts and found that "[t]he word *employee* in the Act must *** be held to mean and include all persons hired to render services of the same general nature that are due from a *mechanic, artisan, miner, laborer* or *servant.*" (70 Ill. App. 3d 374, 377, 387 N.E.2d 1118.) Quoting *People ex rel. Jacobs v. Coffin* (1918), 282 Ill. 599, 606, 119 N.E. 54, 57, the court explained that "[t]he duties and services of a mere employee are purely ministerial, and he is not clothed with the discretion nor with the power to represent or bind the corporation." (70 Ill. App. 3d 374, 377, 387 N.E.2d 1118; accord, *Gasbarra v. Park-Ohio, Inc.* (N.D. Ill. 1974), 382 F. Supp. 399; *aff'd* (7th Cir. 1976), 529 F.2d 529.) Noting that the statute is in derogation of the common law and therefore must be strictly construed (*Waesch v. Elgin, Joliet & Eastern Ry. Co.* (1962), 38 Ill. App. 2d 56, 60, 186 N.E.2d 369, 371), the court concluded that an elected official was not an employee under the statute. 70 Ill. App. 3d 374, 377, 387 N.E.2d 1118.

In the instant case, Koop was suing for wages promised him under two employment contracts with Seattle and Buskirk for which he was to act as a consultant to aid Brumley whenever needed in the day to day operations of the companies. During his employment, Koop was not an officer of these corporations, and had no authority to bind them on any matter. In this respect, he was more in the nature of an

"employee" than was the city clerk in the *Lites* case. However, the services provided by Koop to defendants under the contract were not of the same general degree, kind and nature that are due from a "mechanic, artisan, laborer or servant." Koop's position was more in the nature of an independent contractor, and there is no precedent for the proposition that this type of employment was contemplated by the legislature in the statute in question. We therefore hold that Koop was not an "employee" within the meaning of "An Act providing for attorney's fees when mechanic, artisan, miner, laborer or servant sues for wages" (Ill. Rev. Stat. 1981, ch. 13, par. 13), and was therefore not entitled to attorney fees under the statute.

In accordance with the foregoing, the judgment of the circuit court of Kane County is affirmed in part, reversed in part, and remanded for further proceedings consistent with this opinion.

Affirmed in part, reversed in part, and remanded.

VAN DEUSEN and UNVERZAGT, JJ., concur.