**MICO, INC., Appellant,**

v.

**WAGNER ELECTRIC CORP., Edison International, Inc., and McGraw-Edison Co., Inc., Appellees.**

No. 86–5051.

United States Court of Appeals, Eighth Circuit.

Submitted Sept. 22, 1986.

Decided Oct. 1, 1986.

John M. Bray, Washington, D.C., for appellant.

Sheri H. Mecklenburg, Chicago, Ill., for appellees.

Before McMILLIAN, ARNOLD and BOWMAN, Circuit Judges.

ARNOLD, Circuit Judge.

This appeal presents the question whether the District Court[1] erred in its interpretation and enforcement of a settlement agreement made between the parties. We find no error and therefore affirm.

Wagner Electric is a manufacturer of automotive brake components and lighting products. MICO is a buyer and distributor of Wagner's brake products and also manufactures certain brake components itself. MICO sued Wagner, alleging that Wagner was attempting to injure MICO in the brake-products market. Before trial, the parties entered into a stipulation of settlement which was approved by the Court on April 4, 1985. MICO agreed to dismiss its antitrust and related claims against Wagner. Wagner agreed (1) to pay MICO $250,000; (2) to rectify alleged disparagement of MICO's product through publication to the trade of a clarifying statement; and (3) to issue to MICO a merchandise credit in the amount of $1,000,000. The merchandise-credit stipulation read as follows:

> Defendants will issue a $1,000,000 merchandise only credit memo that can be taken out in trade by Mico. Both parties will cooperate in handling delivery of this merchandise to accommodate the other as to need and availability. The price of the merchandise shall be the lowest

---

1. The Hon. Donald A. Alsop, Chief Judge, United States District Court for the District of Minnesota.

O.E.M. [original equipment manufacturer] installer price of the defendants.

Joint Appendix at 222.

The parties are now at odds over the meaning of the term "merchandise" in the stipulation. MICO argues that it means any goods sold to the auto-parts trade by Wagner. It seeks to take out its merchandise credit in lighting products, taking advantage of the favorable O.E.M. price. Wagner, however, asserts that "merchandise" must be understood in the context of the whole agreement between the parties and therefore is limited to brake components.

MICO moved the District Court in October 1985 to enforce the stipulation according to its "specific and precise terms," i.e., to compel Wagner to apply the credit memo to any merchandise which it offered to the market. Wagner objected that in settling their lawsuit over the marketing of brake components the parties had never intended nor contemplated an agreement extending to unrelated product lines.

The District Court ruled that the parties had intended that the credit memo apply to brake parts only. MICO argues on appeal that there was no ambiguity in the term "merchandise" and that the Court's ruling constituted an improper alteration or reformation of the agreement. It points to an earlier ruling by the Court that "the April 4, 1985 Stipulation for Settlement between the parties is not ambiguous...." Joint Appendix at 135. But that (earlier) ruling related to a different section of the settlement agreement; the definition of the term merchandise was not called into question at all. Interestingly enough, that ruling was preceded by a motion filed by MICO in which it summarized its understanding of the meaning of the settlement agreement. In part, MICO's motion asserted that the agreement required Wagner to "Issue a $1 million merchandise-only credit memo to MICO, allowing MICO to purchase Wagner

*brake components* at Wagner's 'lowest O.E.M. installer price'...." Appellees' Addendum at 2 (emphasis added). If we were to accept MICO's position that the earlier ruling found the meaning of the entire agreement to be clear, then it would be difficult not to take into account MICO's contemporaneous explanation of what that clear meaning was. Nevertheless, we read the District Court's first ruling to have been an adjudication of the question then before it, and not a decision as to whatever unknown problems of interpretation might arise in the future.

Under the law of Illinois, which applies in this contract dispute, the actual words used in a written agreement are important evidence of the meaning of the agreement, but the real question is always the intent of the parties at the time that they agreed. *Mendelson v. Flaxman*, 32 Ill.App.3d 644, 336 N.E.2d 316, 319 (1975). The contract language must be read in the context of the whole agreement and within the circumstances known to the parties at the time it was made. *Stevens v. Fanning*, 59 Ill.App.2d 285, 207 N.E.2d 136, 139 (1965). When contract language is reasonably susceptible of only one meaning within the context, then the ordinary and usual significance of the words should control, since it is presumed that everything in the written contract is put there deliberately and for a purpose. See *Gay v. S.N. Neilson*, 18 Ill. App.2d 368, 152 N.E.2d 468, 472–73 (1958). But few words in the law have such a singular and inflexible meaning that they can be taken as absolute values without regard to context. See generally 3 A. Corbin, *Corbin on Contracts* § 542 (2d ed. 1960). When the court determines that a contract term is undefined or ambiguous in the context, then it must refer to other evidence of intent, including evidence outside the writing itself. See *Howard A. Koop & Associates v. KPK Corp.*, 119 Ill. App.3d 391, 75 Ill.Dec. 276, 282, 457 N.E.2d 66, 72 (1983).[2] A strict and wooden re-

---

2. Typically, the trial court's inquiry into the meaning or interpretation of a disputed contract clause would involve a hearing with live testimony of the principals. Here, the parties submitted the dispute on affidavits and briefs, supplemented by oral argument. Neither side suggests that there was anything wrong with this procedure.

liance on dictionary definitions may be a poor substitute for the meaning which can fairly be inferred from the words and behavior of the parties themselves. In seeking to give effect to a disputed contract term, the court may consider circumstances surrounding the agreement at the time it was made, *Stevens v. Fanning*, 207 N.E.2d at 139, the purposes the parties had in mind, *Kurth v. Forreston State Bank*, 348 Ill.App. 581, 109 N.E.2d 795, 799 (1952), and the subsequent conduct, performance, or utterances of one or both of the parties, *New York Central Development Corp. v. Byczynski*, 95 Ill.App.2d 474, 238 N.E.2d 414, 416 (1968), *cert. denied*, 393 U.S. 1084, 89 S.Ct. 867, 21 L.Ed.2d 777 (1969).

Here, the disputed term "merchandise" is not defined in the written contract. MICO asserts that its plain meaning is "goods," i.e., anything sold by Wagner. But, as we have discussed above, few words used in a legal setting are self-executing without some consideration of context. When the parties have long dealt together only in brake merchandise, have gone to court over a brake-merchandise dispute, and then have agreed to settle that dispute, it is probable that the settlement is in terms of the brake merchandise which has always previously been the substance of trade between the parties. There is no evidence in the record that at any time either party contemplated purchases by MICO from Wagner's general inventory. The District Court, which was amply aware of the legal and factual background of the dispute, and which had participated throughout the development and settlement of the underlying case, did not err in determining the meaning of this contract according to the circumstances surrounding it and the purposes which it was supposed to serve. The Court's conclusion is buttressed by MICO's own statement at an earlier stage of the dispute, as we noted above, that the merchandise credit was to be taken in brake components. The District Court's finding as to the meaning of the ambiguous word "merchandise" is not clearly erroneous.

Affirmed.