ALLIED WIRE PRODUCTS, INC., Plaintiff-Appellant, *v.* MARKETING TECHNIQUES, INC., *et al.*, Defendants-Appellees.—(MOHAWK CARTAGE COMPANY, Plaintiff-Appellee, *v.* ALLIED WIRE PRODUCTS, INC., *et al.*, Defendants-Appellants.)

First District (2nd Division)    No. 80-724

Opinion filed August 4, 1981.—Rehearing denied September 4, 1981.

30

Carl L. Klein, Ltd., of Oak Lawn, for appellants.

B. John Mix, Jr., of Chicago, for appellees.

Mr. JUSTICE PERLIN delivered the opinion of the court:

Plaintiff, Allied Wire Products, Inc. (Allied) sued defendants Marketing Techniques, Inc. (Marketing) and George Vajdik (Vajdik) to recover amounts allegedly due and owing to Allied for its fabrication of certain products at Marketing's request. In its original complaint Allied sought judgment in the amount of $28,537.25 which included $606 in storage charges Allied assessed against Marketing for six days storage of 101 cartons at the rate of $1 per carton per day. Marketing denied Allied's allegations and counterclaimed for breach of an oral contract. In the counterclaim Marketing asked $260,000 in compensatory and punitive damages for loss of good will. Allied then filed count II of its complaint seeking $28,537.25 in damages on the basis of *quantum meruit* and an additional $55,000 for storage of cartons and parts inventory acquired in connection with Marketing's orders.

Plaintiff Mohawk Cartage Co. (Mohawk) brought action against Allied and Marketing to recover $712.50 in damages for services rendered. Mohawk's suit was subsequently consolidated with the suit between Allied and Marketing, and both actions were heard at a bench trial. Allied and Marketing stipulated that Mohawk had performed the services in question and that the value thereof was reasonable.

After trial the court dismissed Allied's complaint, finding Allied to have breached a contract with Marketing. The court also dismissed Marketing's counterclaim, finding that although Marketing proved the existence of a contract and a breach by Allied, it failed to prove its asserted damages. Marketing has not appealed that determination. The court entered judgment in favor of Mohawk against Marketing but subsequently amended its order, finding Allied to be primarily and Marketing secondarily liable to Mohawk. On timely post-trial motion of Allied, the trial court refused to reconsider its dismissal of Allied's complaint or to issue special findings of fact.

On appeal Allied contends (1) that the trial court erred in finding an enforceable contract between Allied and Marketing and in finding that Allied had breached that contract; (2) that the trial court should have entered judgment for Allied on the basis of *quantum meruit*; (3) that the trial court should have found that there was an account stated; and (4) that the trial court erred in finding Allied primarily liable to Mohawk.

For the reasons which follow, we affirm the judgments of the circuit court of Cook County.

The principal issue in the trial of this cause was whether Allied and Marketing had entered into an enforceable express oral contract for the production of certain advertising display stands.

The evidence established that in 1976 Allied was a 23-year-old Illinois corporation whose principal business was the fabrication of display stands and other items, including construction of prototypes, manufacture and design of parts, supervisory work, packaging and shipping. Reginald Shikami was a shareholder, director, president and chief executive officer of Allied. Defendant Marketing, an advertising-graphic arts company, was owned by defendant George Vajdik.

Early in 1976 Marketing received an opportunity to bid upon advertising display stands for two new television models (the black and white "Sportable" and the color "Colortrak") which RCA intended to introduce as part of its 1977 product line. The display stands were to be placed in dealers' showrooms featuring the televisions and were to coincide with newspaper, radio and television promotions of the new sets.

Shikami testified to the following:

In February 1976 Vajdik contacted him about the manufacture of the display racks. Vajdik showed sketches of the stands to Shikami who thereafter provided Vajdik with estimated costs of their production. On March 23, 1976, Vajdik picked up two prototypes fabricated by Allied. The prototypes underwent subsequent alterations.

On March 25, 1976, Vajdik, having shown the prototypes to RCA, called Shikami to tell him that Marketing might be awarded the contract based on the estimated figures of February 1976 which reflected the original and since discarded sketches. Shikami informed Vajdik that it was impossible to make the display units according to the estimated figures since there had been so many changes from the original sketches on which those figures had been based.

Vajdik then advised Shikami that RCA required 4,000 display units for the Colortraks and 3,000 for the Sportables by June. Shikami said that he could not produce that many units by June but that he would make whatever parts he could manage (e.g., x-braces, pockets and signholders) and would find sources for obtaining the rest of the parts so that Marketing could make its own arrangements with such sources. Vajdik agreed to this proposal and Shikami provided him with a list of potential suppliers of goods (e.g., tube steel) and services (processors, platers and packers) needed for the production of the display stands. Marketing issued all purchase orders as per quotations received from the various suppliers and issued its own checks to the suppliers in payment of their invoices.

On March 30, 1976, Shikami gave Vajdik estimated costs of $19.71 and $41.62 for the Sportable and Colortrak display units, respectively, per the verbal, unconfirmed estimates Shikami had received from suppliers. The exact costs were to be determined after the design and prototypes

were examined by the suppliers. Further changes in the structure and composition of the display units, all as directed by RCA, were made with final changes coming as late as April 1976. Shikami denied that he ever agreed to furnish Marketing with completely fabricated display stands for the estimated unit costs quoted on March 30, 1976.

On May 27, 1976, Vajdik requested in writing to Shikami that Allied oversee "that all metal and fabricated parts received to be incorporated within this schedule." In May or June Shikami and Vajdik were informed by Vogel Tool that Vogel could not get the merchandise out on time because it had not been advised of the size of the order and the delivery schedule until it received the request from Vajdik. Vajdik then asked Shikami to help him find other sources to meet the delivery schedules. A few days later Shikami telephoned Vajdik and gave him other sources to contact. Later in June Shikami and Vajdik had trouble with their packing source and Shikami found a new packer. Vajdik asked Allied to help with the packing and Allied agreed.

In July Vajdik requested that Allied proceed with a rerun—*i.e.*, a further order of identical units. Marketing did not send Allied a written purchase order for either the rerun or the original order. Shikami informed Vajdik that Allied could not proceed on a reorder unless it was paid for the work already done. Vajdik first insisted that Allied could not be paid until the entire order was completed but then stated that partial payment could be managed. At Vajdik's request, Allied sent Marketing a bill on August 12, 1976, for $29,684.51. According to Shikami, Vajdik did not object to the bill and Allied received payment of $5,000. As in the case of the original order, Shikami denied that he agreed to a per unit price on the rerun.

On September 7 or 8, 1976, Shikami told Vajdik that all orders had been shipped to RCA dealers including one last order of 101 units, and that he would like to pick up a check from Vajdik. Vajdik refused to give him a check. Shikami then called the trucking company, asked them to return the 101 units, stored the cartons and informed Marketing of the storage charges to come. Marketing refused to pay Allied for any of the units which had been made, or for the remaining cartons, or for packaging or storage. Marketing also refused to remove the cartons.

In support of his *quantum meruit* claim, Shikami gave a detailed account of the basis for the invoices he sent to Marketing. The invoices included charges for developing the prototypes and samples, fabricating parts, outside purchases, jigs and tooling, rental of machinery from Vogel Tool, packing labor, prepaid freight and handling, overhead and storage.

George Vajdik testified as follows:

At their first meeting in February 1976 Vajdik informed Shikami of

the delivery schedule required by RCA.[1] Shikami gave Vajdik price estimates. A week later Vajdik told Shikami that he needed prices as quickly as possible. Allied thereafter gave Vajdik an estimated price on March 12 and Vajdik took artistic renderings and estimated costs to RCA.

RCA showed an interest in two of the units, and on March 13 or 14, 1976, Shikami was asked to prepare prototypes and pricing for those units. On March 23 Vajdik spoke to Shikami and asked for pricing so that his letter of presentation could be given to RCA. On the same day Vajdik picked up the prototypes from Shikami and again discussed estimated prices. The next day Vajdik drove to Indianapolis and presented the prototypes to RCA. Immediately after returning to Chicago from Indianapolis, Vajdik told Shikami that "it was 99% in the bag." Shikami was then told that Vajdik needed firm pricing so that a final quote could be made to RCA.

On March 30, 1976, Shikami gave Vajdik firm prices on the display stands for the Sportable and Colortrak television sets. The prices were $19.71 and $41.62, respectively. These prices were accepted by Vajdik. It was also agreed that Marketing Techniques would finance the manufacture of these units because Allied was not in a financial position to do so. The agreement on financing and prices is reflected in Shikami's notes of March 30, 1976, identified as Plaintiff's Exhibits 401(a) and (b). These agreed prices and the specifications were to be sent to Marketing by Allied, but despite Shikami's repeated assurances that they would be sent, Marketing never received them.

Under the terms of their oral agreement, Marketing was to pay Allied the per unit price for the total number of displays fabricated for RCA less the costs, including packing labor, which Marketing incurred in financing their construction. The unit prices quoted by Allied did not include the costs of graphics (*e.g.*, artwork, photography, printing), mounting of graphics, shipping containers and inner packing materials for which Marketing alone was responsible.

Based on Shikami's prices and the prices of the other subcontractors who participated in the production of graphics, Vajdik quoted a firm price to RCA on March 30, 1976, and confirmed it in writing to RCA on April 5 and April 9. On April 13, having received "official word" from RCA, Vajdik called Shikami and informed him that they had the contracts for both the black and white and the color presentations.

With the exception of the graphics suppliers and a tubing company, Shikami contacted and received prices from, and arranged quantities

---

[1] Three units were to be sent to Lake Tahoe for RCA's national distributors meeting in May 1976 when RCA was to unveil its 1977 line of television products. Ninety-seven more were to be delivered to the distributors in the latter part of May. The balance of the total order of 3,000 Sportable displays and 4,000 Colortrak displays was to be shipped to RCA dealers on June 14, 1976.

with, each supplier connected with the manufacture of the display stands. At no time in Vajdik's business career had he engaged in the manufacture of any items such as the units contracted to be produced by Allied.

The day before Vajdik went on vacation in May of 1976 he called Shikami, inquired as to the progress of the job and was told that everything was going along well. On the same day Vajdik contacted the graphic arts suppliers and mailed a letter to Allied as well as the graphic arts suppliers verifying their shipping instructions and advising them that the completed units were to be shipped on June 14, 1976. When Vajdik returned to work in late June, he discovered that "we had a bloody horror story on our hands." Shikami told him that no units had been shipped.[2] Evidently Vogel Tool, which claimed that it had never received delivery dates, had not met its schedule. The shipments did not commence until June 29 and continued into October. Vajdik attempted on many occasions to obtain shipping schedules from Shikami so he could advise RCA when the units would arrive. He received six to eight different schedules from Shikami, none of which was met. The balance of the reorder was never shipped.

The exhibits introduced into evidence indicate that RCA originally ordered 3,000 displays for the Sportables and 4,000 for the Colortraks. All 7,000 were manufactured and drop-shipped to RCA dealers. While the shipments of the original order were still underway, RCA reordered 425 displays for the Sportables and between 525 and 550 for the Colortraks. According to Vajdik, Shikami agreed to produce a rerun of the Sportable and Colortrak displays, not to exceed 500 units each, for, respectively, $27.89 and $48.92. Only 330 Sportable displays were fabricated of which 229 were delivered. Shikami retrieved the balance (101) from the shipper after Vajdik informed him that he was not going to be paid. Three hundred ninety-one Colortrak displays were manufactured and delivered.[3] RCA paid Marketing for all of the displays that were actually delivered to RCA dealers.

Vajdik testified that when he received Allied's bill on August 19, 1976, he telephoned Shikami and asked him why Allied had sent the bill. Shikami told Vajdik that he wanted to "get some money out of this thing now." Vajdik advised him that their agreement was that Shikami would be paid at the end of the job when all of Marketing's costs were accounted for and had been subtracted from the prices quoted on March 30, 1976. Shikami hung up on Vajdik. Less than a week later Shikami telephoned Vajdik and told him that he wanted two things—a partial payment and a

---

[2] Shikami testified that he knew of the difficulties in his portion of the project in April or May of 1976 but did not inform Vajdik of the problems. He knew Vajdik was going on vacation: "This is one of the reasons I didn't tell him, I wanted him to enjoy himself."

[3] Shikami testified that Allied shipped a total of 3,227 Sportable displays and 4,262 Colortraks.

signed statement from Vajdik that he would pay the bill in its entirety. When Vajdik refused, Shikami told him that unless Vajdik paid him some portion of the bill, he would stop shipping the display stands. Vajdik stated that he then agreed to give Shikami a check for $5,000 because he had no choice if he was to avoid defaulting on his contract with RCA.

With respect to Mohawk's claim against Allied and Marketing, Shikami admitted that Allied had ordered Mohawk's services but said that he had informed Mohawk that Allied was acting as an agent of Marketing and that all freight bills should be sent directly to Marketing. Mohawk's terminal manager, Peter Galiardo, testified, however, that Allied never indicated that it was acting in the capacity of an agent for Marketing.

At trial Allied introduced into evidence an exhibit which purported to be a page of Marketing's bookkeeping entries on which five separate figures for Mohawk Cartage were listed as part of Marketing's costs for its RCA contract. Two of the figures corresponded to freight bills which Marketing paid. The other three corresponded to the unpaid billings for which Mohawk had sued.

On January 9, 1980, the trial court found that Mohawk was entitled to recover $712.50 against Marketing and that Allied had acted as Marketing's agent. The court also found that Allied and Marketing had entered into a contract on or about March 30, 1976, and that Allied had breached the contract by "failing to make deliveries as promised" and by "refuting the contract and attempting to establish a new agreement." The court therefore dismissed Allied's complaint. The court also dismissed Marketing's counterclaim because the court found that Marketing failed to prove any damages. The court's findings were incorporated into a written order which made no reference to the date on which the parties had entered into their contract.

On March 7, 1980, the trial court amended its order of January 23, 1980, as to the Mohawk judgment and found that Allied was primarily liable to Mohawk and Marketing secondarily liable.

## I, II

The principal issue in this appeal is whether the trial court properly found that Allied and Marketing entered into an enforceable contract on or about March 30, 1976. Allied argues that the court's finding was both factually and legally in error. We shall address the legal issues first.

Allied contends that the contract violates the Statute of Frauds provision of the Uniform Commercial Code (Ill. Rev. Stat. 1975, ch. 26, par. 2—201(1)). Section 2—201(1) states that, subject to certain exceptions listed in the section, no contract for a sale of goods at a price of $500 or more is enforceable by way of action or defense unless evidenced by a writing signed by the party to be charged or his authorized agent or

broker. Since there was no such writing, Allied argues that Marketing could not allege and prove the terms of an express oral contract in defense against Allied's *quantum meruit* claim.

■■ Under subsection 2—201(3)(c) of the Code, however, a contract which does not satisfy the requirements of subsection (1) but which is valid in other respects is enforceable "with respect to goods * * * which have been received and accepted * * *." (Ill. Rev. Stat. 1975, ch. 26, par. 2—201(3)(c); *Lippold v. Beanblossom* (1974), 23 Ill. App. 3d 595, 319 N.E.2d 548.) All of the displays that were shipped were received and accepted by RCA's dealers. This conduct "constitutes an unambiguous overt admission by both parties that a contract actually exists." (Ill. Ann. Stat., ch. 26, par. 2—201, Uniform Commercial Code Comment 2, at 114 (Smith-Hurd 1963); *Gerner v. Vasby* (1977), 75 Wis. 2d 660, 250 N.W.2d 319, 324.)[4] Although the displays were received and accepted by RCA's dealers, not Marketing Techniques, "the acceptance and receipt required to remove the transactions from the Statute of Frauds may be made by someone authorized by the buyer to receive and accept the goods." *Mawer-Gulden-Annis, Inc. v. Brazilian & Colombian Coffee Co.* (1964), 49 Ill. App. 2d 400, 406, 199 N.E.2d 222. Accord, *Dairyman's Cooperative Creamery Association v. Leipold* (1973), 34 Cal. App. 3d 184, 188, 109 Cal. Rptr. 753, 755-56; *Engel Mortgage Co. v. Triple K Lumber Co.* (1975), 56 Ala. App. 337, 342, 321 So. 2d 679, 683.

■■ Taking the contract out of the Statute of Frauds does not establish the terms of the contract; it merely removes the statute as a bar to enforcement of the contract by way of action or defense. Allied contends that the testimony of George Vajdik and his secretary-treasurer, Christine Razmus, regarding the terms of the contract was inadmissible because it was derived from wiretap tapes and transcripts obtained in violation of the Illinois eavesdropping act (Ill. Rev. Stat. 1975, ch. 38, par. 14—1 *et seq.*).

Prior to trial, Allied discovered in Marketing's possession a tape roll inside a box marked "Tape Recordings of Conversations with R. Shikami." The box was dated September 7, 1976. On Allied's motion, which Marketing did not oppose, the trial court barred Marketing from introducing the tape into evidence.

Allied also requested the trial court to listen to the tape *in camera* and identify the conversations recorded so that Allied would be able to prevent their derivative use which is also prohibited by the statute under the "fruit of the poisoned tree" doctrine enunciated in *People v. Maslowsky* (1966), 34 Ill. 2d 456, 465, 216 N.E.2d 669. The trial court denied the

---

[4] An oral contract for the sale of goods which has been partially performed is enforceable at the insistence of either party to the oral contract. *Mann v. Commissioner of Internal Revenue* (8th Cir. 1973), 483 F.2d 673, 678-79; *Cohn v. Fisher* (1972), 118 N.J. Super. 286, 296-97, 287 A.2d 222, 227-28.

request but invited counsel for Allied to listen to the tape which he declined to do. On appeal Allied argues that since some or all of Vajdik and Razmus' testimony regarding the details of conversations with Shikami may have been derived from the tape, it was error for the trial court not to listen to the tape. We reject this contention.

Whether the suppressed tape included any of the conversations with Shikami which Vajdik and Razmus recounted at trial is totally speculative. Allied's counsel refused an opportunity to listen to the tape himself. Had counsel accepted the court's offer, he could have perhaps established as fact, if it were true, what he can now advance only as theory. We will not reverse a judgment on an unsupported hypothesis that trial testimony may have been derived from illegally obtained recordings.

Relying upon Shikami's testimony, Allied also contends that there was no meeting of the minds between Allied and Marketing regarding a contract for the fabrication of finished displays. George Vajdik, however, testified to facts which, if believed, proved that a contract was entered into on March 30, 1976. Allied maintains that Vajdik's testimony was not credible. This was a matter to be decided by the trial court.

> "Ours is not the fact-finding function; we do not concern ourselves with resolving conflicts in evidence, its weight or with the credibility of witnesses. These are all matters for the trier of the facts who heard the witnesses give their testimony in his court. It is the trial court, when sitting without a jury, who must determine where the truth lies. [Citation.] The presumption is that the trial judge heard sufficient evidence upon which to base his judgment and the [appealing party] * * * has the burden of showing by the record, that the judgment is manifestly against the weight of the evidence. [Citations.]" *Croft v. Lamkin* (1969), 112 Ill. App. 2d 321, 327-28, 251 N.E.2d 88.

Upon our review of the testimony and exhibits in this case[5] we conclude that the trial court's finding that there was an express contract between the parties was not against the manifest weight of the evidence.

Under the terms of the contract, Marketing was to pay Allied the per unit price for the total number of displays fabricated less the costs, including packing labor, Marketing incurred in financing their manufacture. Marketing's costs, however, exceeded Allied's unit prices for the number of displays that were actually produced. Even in the absence of a material breach, it is apparent that under the express terms of their contract, Allied was not entitled to any recovery from Marketing. We therefore need not decide whether Allied breached the contract by

---

[5] The record transmitted to this court consists of 390 pages of pleadings and depositions, more than 1,000 pages of testimony, almost 600 marked exhibits and several hundred additional unmarked exhibits.

"failing to make deliveries as promised" and "by refuting the contract and attempting to establish a new agreement."

■■ With respect to Allied's claim for storage charges, we note that under the Uniform Commercial Code, "the seller * * * may stop delivery of * * * truckload, * * * or larger shipments of express or freight when the buyer * * * fails to make a payment due before delivery * * *." (Ill. Rev. Stat. 1975, ch. 26, par. 2—705(1).) Under the contract, however, no payment was due and thus Allied had no right to stop the last shipment of displays. "Improper stoppage is a breach by the seller if it effectively interferes with the buyer's right to due tender under the section on manner of tender of delivery." (Ill. Rev. Stat., ch. 26, par. 2—705, Uniform Commercial Code Comment 1, at 523 (Smith-Hurd 1963).) Since Marketing had not breached its contract with Allied, Allied was not an "aggrieved seller"[6] and therefore could not recover its storage charges as incidental damages.[7]

Allied concedes that if there was an enforceable express oral contract, then it could not recover on a *quantum meruit* or implied contract theory. (See *Laff v. Chapman Performance Products, Inc.* (1978), 63 Ill. App. 3d 297, 310, 379 N.E.2d 773; *Dorocke v. Farrington* (1963), 43 Ill. App. 2d 394, 398, 193 N.E.2d 593; *Goodman v. Motor Products Corp.* (1959), 22 Ill. App. 2d 378, 384-85, 161 N.E.2d 31.) Since we have affirmed the trial court's finding that there was an express contract, we hold that the court properly denied judgment for Allied on its *quantum meruit* count.

## III

Allied contends that the trial court erred in not entering judgment for Allied on the basis of an account stated. In support of this contention Allied points out that on August 12, 1976, it sent Marketing an itemized invoice for $29,684.51. The invoice listed charges for labor, materials, costs and prepaid freight. Shikami testified that neither Vajdik nor his secretary-treasurer objected to the statement (which Shikami said Vajdik himself had requested in late July after Shikami advised him of Allied's pressing need for funds). It is undisputed that Vajdik gave Allied a check for $5,000 on August 26, one week after Marketing received the bill.

■■■ An "account stated" has been defined as "an agreement between

---

[6] An "aggrieved party" is defined by the Code as "a party entitled to resort to a remedy." Ill. Rev. Stat. 1975, ch. 26, par. 1—201(2).

[7] Section 2—710 of the Code states: "Incidental damages to an aggrieved seller includes any commercially reasonable charges, expenses or commissions incurred in stopping delivery, in the transportation, care and custody of goods after the buyer's breach, in connection with return or resale of the goods or otherwise resulting from the breach." Ill. Rev. Stat. 1975, ch. 26, par. 2—710. See *Servbest Foods, Inc. v. Emessee Industries, Inc.* (1980), 82 Ill. App. 3d 662, 670, 403 N.E.2d 1.

parties who have had previous transactions that the account representing these transactions is true, so that the balance is correct, together with a promise which may be express or by implication for payment of this balance." (*Soft Water Service, Inc. v. M. Suson Enterprises, Inc.* (1976), 39 Ill. App. 3d 1035, 1040, 351 N.E.2d 264.) The agreement must manifest the mutual assent of both the debtor and the creditor. (*Canadian Ace Brewing Co. v. Swiftsure Beer Service Co.* (1958), 17 Ill. App. 2d 54, 60, 149 N.E.2d 442.) The meeting of the parties' minds upon the correctness of an account is usually the result of one party rendering a statement of account to which the other party acquiesces. (*Motive Parts Co. of America, Inc. v. Robinson* (1977), 53 Ill. App. 3d 935, 938, 369 N.E.2d 119.) The form of acquiescence is immaterial, however, and the meeting of the minds may be inferred from the conduct of the parties and the circumstances of the case. *Motive Parts Co. of America*, at 939.

■■ Repeatedly it has been held that where a statement of account is rendered by one party to another and is retained by the latter beyond a reasonable time without objection, this constitutes a recognition by the latter of the correctness of the account and establishes an account stated. *Motive Parts Co. of America*, at 939; *Malkov Lumber Co. v. Wolf* (1971), 3 Ill. App. 3d 52, 54-55, 278 N.E.2d 481; *Canadian Ace Brewing Co.*, at 60.

Upon our review of the evidence in this case, however, we are unable to conclude that Allied proved an account stated. In order to have an account stated there must be mutual assent to the account by both parties. Although Shikami testified that Vajdik never objected to the August 12, 1976, statement, Vajdik flatly contradicted this testimony.

Vajdik stated that when he received Allied's statement on August 19, he called Shikami and asked him why he had sent a bill. Shikami said that he "wanted to get some money out of this thing now." Vajdik reminded Shikami that under the terms of their agreement Allied was to be paid only after all RCA orders had been completed and all of Marketing's costs of financing the displays had been subtracted from the prices Shikami quoted on March 30, 1976. Shikami then hung up on Vajdik.

Six days later, August 25, Shikami called Vajdik and demanded an immediate partial payment from Marketing and a signed letter from Vajdik promising to pay the account in full. When Vajdik refused, Shikami threatened to stop all shipments of the displays unless he was paid. To avoid defaulting on his contract with RCA Vajdik agreed to give Shikami a check which an Allied employee picked up the following day (August 26) at Marketing's office. Shikami himself testified on cross-examination that he told Vajdik that if Allied "couldn't get anything on account, we ourselves were going to have to start doing other things so that we could get money in." Shikami could not definitely recall whether he had threatened to stop the shipments.

■■■ If the trial court chose to believe Vajdik's testimony, it is apparent that there was no acquiescence, either express or implied, to Allied's August 12 invoice. In the absence of an objection, a partial payment on account may strengthen an inference that there is an account stated. (*Soft Water Service, Inc. v. M. Suson Enterprises, Inc.* (1976), 39 Ill. App. 3d 1035, 1040, 351 N.E.2d 264.) A prompt objection to a statement of account, however, prevents an account stated, even though a payment is made at the same time. (6 Corbin on Contracts §1313, at 272-73 (1962).) Moreover, under the circumstances related by Vajdik, that he was compelled to make a payment to Allied to avoid defaulting on his own contract with RCA, his payment could not be regarded as an acknowledgment of a balance due. An assent to an account must be voluntary. *Shane v. De Leon* (1930), 258 Ill. App. 433, 437.

Allied contends further, however, that Vajdik objected only to the timing of the statement and not "to either the amount or the form of the bill." With this we are unable to agree. According to Vajdik's understanding of the contract between Allied and Marketing, Marketing's obligation to Allied was dependent upon a variety of factors and could not be computed until after the RCA contracts were completed and all of Marketing's costs of financing the construction of the displays were subtracted from the prices for which Allied had agreed to manufacture them. An account stated presupposes an absolute acknowledgment or admission of a certain sum due; if the assent to the amount due is qualified, there is not an account stated. *West Lands Construction Co. v. Calhan* (1970), 124 Ill. App. 2d 453, 456, 259 N.E.2d 408.

■■ When the existence of an account stated is disputed, the issue of whether it exists is a fact question which, in a bench trial, is properly resolved by the court sitting as the trier of fact. (*Motive Parts Co. of America, Inc. v. Robinson* (1977), 53 Ill. App. 3d 935, 940, 369 N.E.2d 119.) By its judgment in this case the trial court determined that no account stated had been established. On the basis of the record before us, we cannot hold that this determination was against the manifest weight of the evidence.

## IV

Finally, we address Allied's argument that the trial court erred in finding Allied primarily liable for sums due Mohawk Cartage.

Shikami admitted at trial that Allied had ordered the services for which Mohawk had brought suit but claimed that he had advised Mohawk that he was acting as an agent for Marketing and that all bills should be sent directly to them. Mohawk's terminal manager testified, however, that Allied failed to indicate its agency relationship when it placed the orders; and all of the invoices were sent directly to Allied. At

trial Allied introduced oral and documentary evidence that Marketing considered the unpaid shipping charges part of its own costs.

The question as to who was legally responsible for Mohawk's billings was a factual issue to be resolved by the trial court, and we are not prepared to state that its judgment was against the manifest weight of the evidence.

For the foregoing reasons, the judgments of the circuit court of Cook County are affirmed.

Affirmed.

STAMOS and DOWNING, JJ., concur.