KENNETH S. HARTBARGER, Plaintiff-Appellee, v. SCA SERVICES, INC., Defendant-Appellant.

Fifth District No. 5—88—0675

Opinion filed July 25, 1990.

Robert L. Jackstadt, of Peper, Martin, Jensen, Maichel & Hetlage, of Wood River, for appellant.

Floyd D. Peterson, Jr., of Law Offices of William W. Schooley, of Granite City, for appellee.

JUSTICE GOLDENHERSH delivered the opinion of the court:

Defendant, SCA Services, Inc., appeals from a judgment of the circuit court of Madison County entered after a jury verdict in favor of plaintiff, Kenneth S. Hartbarger, in the amount of $225,000 for the breach of an oral contract. In this cause, defendant raises the following issues: (1) whether the parol evidence rule and collateral contract doctrine bar plaintiff's oral contract claim; (2) whether sufficient independent consideration, definiteness, or certainty existed to support the separate oral contract; (3) whether the trial court improperly instructed the jury by giving plaintiff's instructions numbers 10 and 11; (4) whether the Statute of Frauds (Ill. Rev. Stat. 1979, ch. 59, par. 1 *et seq.*) barred plaintiff's oral contract claim; and (5) whether the verdict is supported by the evidence. This court affirms.

Plaintiff originally owned a landfill near Granite City. In 1971, plaintiff and his partner sold the landfill to defendant, a Delaware corporation involved in the waste hauling and disposal business. Plaintiff later took a position with defendant and eventually became a vice-president and central division manager for defendant, controlling defendant's operations in 30 States at a salary of $87,500 per year. His employment contract with defendant provided for an annual bonus of one-half his salary and severance pay of one-half his salary if plaintiff were ever terminated. Plaintiff was involved in an automobile accident in August 1979, in which he sustained physical injuries as well as memory loss. This accident was in no way related to his employment with defendant. Plaintiff eventually went back to work for defendant on October 10, 1979, but was terminated in January 1980.

Plaintiff and representatives of defendant had a meeting in Boston on February 19, 1980, concerning plaintiff's termination. Defendant's chairman of the board had given attorney Robert Popeo full authority to negotiate a deal on behalf of defendant. Plaintiff and defendant attempted to work out an agreement which would compensate plaintiff, as well as protect defendant from any competition with plaintiff. The parties were able to reach an agreement in principle,

but many items and terms were left open. No final agreement was reached at this time, and no papers were signed. A written agreement was not signed until September 24, 1980. In the interim, several meetings occurred and several promises were made. During the time between the parties' first meeting on February 19, 1980, and the signing of a termination agreement on September 24, 1980, plaintiff became involved in a number of ventures in the landfill business that were in direct competition with defendant. These acquisitions occurred after March 27, 1980, when plaintiff's attorney, John Farrell, sent a letter to defendant's attorney, Popeo, indicating that because no written agreement had been sent to plaintiff by defendant, and since no payments to plaintiff had been made, the settlement talks were withdrawn. On April 25, 1980, Farrell sent another letter to Popeo renewing the settlement talks. Another meeting was held on September 10, 1980, to work out a final agreement. Plaintiff, his two attorneys, Farrell and Thomas Long, and defendant's attorney, Popeo, attended this meeting. Popeo learned that plaintiff had acquired seven additional companies since the parties' original meeting in February 1980. Plaintiff explained to Popeo that he had acquired a substantial amount of debt by starting these companies. In addition to the terms that had been discussed at the original meeting, i.e., severance pay, bonus, health insurance, plaintiff asked for an additional $150,000 to $200,000 for his newly acquired businesses. According to attorney Long, discussions took place as to the allocation of this $150,000 to $200,000 among three of plaintiff's businesses on which defendant had options to purchase. These three businesses were known as the Trusik accounts, the Wagner landfill, and a hazardous material site referred to as "Hazmat." All parties agreed that no final agreement was made at this meeting. Popeo testified that he made no representations to plaintiff or plaintiff's attorneys about any additional compensation for the Trusik, Wagner, or Hazmat transactions.

The final meeting took place in St. Louis at plaintiff's attorneys' office. In attendance were plaintiff, his wife, Gaynell, plaintiff's attorneys, Long and Farrell, and defendant's representative, Popeo. At this meeting, defendant tendered a check through Popeo to plaintiff and his wife for $228,000. This check represented payment for 130 acres of land in Wilsonville, Illinois, and was made payable to the Richtone Corporation, a corporation held in trust and controlled by plaintiff. The termination agreement indicated that the $228,000 was allocated for real estate only. According to plaintiff and his attorneys, plaintiff then told Popeo that he would not sign any agreements unless he was paid an additional $200,000. According to plaintiff, Popeo

then made a phone call after which he counteroffered a figure of $175,000. Plaintiff testified that he insisted he must receive $200,000, and Popeo finally agreed on behalf of defendant. Plaintiff and his attorneys, Long and Farrell, testified that Popeo suggested that the $200,000 be distributed in three separate transactions. This manner was suggested because Popeo had authority to approve transactions under $100,000 without approval from defendant's board of directors. The termination agreement included an option agreement for defendant to buy the three previously mentioned properties of plaintiff—the Trusik accounts, the Wagner landfill, and the Hazmat site. The option agreement signed by the parties states, in pertinent part:

"2. Global hereby grants to SCA the option to acquire from Global the Trusik Business, other than the trucks and equipment listed on Schedule A attached hereto, for a price of Seventy Thousand Dollars ($70,000) to be paid in the same manner as Global is paying for its acquisition of the Trusik Business. Global represents and warrants that it is the owner of the Trusik Business, which consists primarily of certain contracts and accounts, free and clear of all claims, liens and encumbrances and has full right to convey the same to SCA.

3. Global hereby grants to SCA the option to acquire from Global the Wagner Business for the price to be paid therefor by Global, which price shall be payable in the same manner as payments are to be made to Wagner by Global under the Wagner Business Agreement. Global represents and warrants that upon closing under the Wagner Business Agreement, it will be the owner of the Wagner Business, which consists of certain equipment, contracts and accounts, free and clear of all claims, liens and encumbrances, except as set forth in the Wagner Business Agreement, and will have full right to convey the same to SCA.

4. Global hereby grants to SCA the option to acquire from Global the Wagner Landfill for the price to be paid therefor by Global, which price shall be payable in the same manner as payments are to be made to Wagner by Global under the Wagner Landfill Agreement. Global represents and warrants that upon closing under the Wagner Landfill Agreement it will be the owner of the Wagner Landfill free and clear of all claims, liens and encumbrances, except as set forth in the Wagner Landfill Agreement, and will have full right to convey the same to SCA.

5. Global hereby grants to SCA the option to acquire from

Global the Hazmat site and license for the price and on the terms under which Global may acquire the Hazmat site and license under the Hazmat option. Global represents and warrants that, upon the grant and exercise of the Hazmat option, it will be the owner of the Hazmat site and license, free and clear of all claims, liens and encumbrances and will have the full right to convey the same to SCA."

The additional $200,000 was to be distributed in the following manner: (1) $25,000 would be added to the written purchase price of $70,000 defendant had agreed to pay for the Trusik accounts; (2) $75,000 would be added to the purchase price of the Wagner landfill; and (3) $100,000 would be added to the purchase price of the Hazmat site. Plaintiff testified that he signed the termination and option agreements only because of Popeo's promise to pay him an additional $200,000, which he felt would adequately compensate him for debts he had incurred by acquiring landfill businesses in direct competition with plaintiff during the interim between the first meeting and the parties' final meeting. These businesses are collectively referred to as the Global Waste Services accounts. Popeo denies making promises for any additional compensation.

The termination agreement also provided for a no-competition clause. By signing the agreement, plaintiff agreed not to compete with defendant for a period of two years. Paragraph 1 of the termination agreement also provided:

"Hartbarger acknowledges receipt of payment in full of all salary, termination pay, and other compensation and benefits due to him as an employee of SCA, and agrees that he is not entitled to any further salary, termination pay, retirement or pension benefits or other compensation or benefits of any nature with respect to his employment by SCA or the termination thereof * * *."

Paragraph 12 also provided:

"This Agreement constitutes the entire agreement and understanding between the parties in relation to the subject matter hereof and there are no promises, representations, conditions, provisions or terms related thereto other than those set forth in this Agreement."

As per the option agreement, defendant purchased the Trusik accounts from Global Waste Services of St. Louis, a corporation held by plaintiff, but for a higher price than appeared in the option agreement. Plaintiff received two checks from defendant in the amounts of $86,271.51 and $8,728.49, respectively, for a total of $95,000. Popeo

testified that defendant believed the Trusik accounts were worth $140,000, and, thus, defendant had made a good business decision to purchase the Trusik accounts for $95,000. The options on the Wagner landfill and the Hazmat site were never exercised.

On January 24, 1983, plaintiff and Global Waste Services of St. Louis, Inc., filed a nine-count complaint against defendant. Counts I, IV and VII pleaded a cause of action under the Illinois Antitrust Act (Ill. Rev. Stat. 1979, ch. 38, par. 60—7). Counts II, V and VIII alleged breach of an oral contract by defendant. Counts III, VI and IX pleaded a cause of action for unjust enrichment. Before trial, on March 2, 1984, the trial court dismissed counts VII, VIII and IX. At the close of plaintiff's evidence, the trial court directed a verdict in favor of defendant on the antitrust and unjust enrichment causes of action contained in counts I, III, IV and VI. At the close of all the evidence, the trial court directed a verdict in favor of defendant on count V. The remaining issue was plaintiff's oral contract claim against defendant found in count II. The jury found in favor of plaintiff for $225,000.

The first issue we are asked to consider is whether the parol evidence rule and the collateral contract doctrine bar plaintiff's oral contract claim. Defendant argues the termination agreement referred to the Trusik, Wagner, and Hazmat transactions and plaintiff should not be allowed to circumvent the parol evidence and collateral contract doctrines by alleging a separate oral contract. Defendant further argues that the written termination agreement between the parties explicitly provided that the agreement contained the entire understanding between them and superseded all previous agreements; therefore, no extrinsic evidence should have been considered or introduced construing the termination agreement. For these reasons, defendant contends that the trial court erred in denying its motion for summary judgment, directed verdict, and judgment notwithstanding the verdict. Plaintiff replies that the parol evidence rule does not bar evidence of the separate oral contract in the instant case since, first, the parol evidence rule does not apply to nonintegrated agreements. Plaintiff contends that the contracts in this case are nonintegrated; the option agreement, for example, provided that defendant could purchase the Trusik accounts for $70,000, but defendant actually paid $95,000. The contracts, therefore, are not integrated since they do not contain the final agreement between the parties. Second, plaintiff contends that the parol evidence rule is not a bar to evidence of the oral contract because plaintiff did not seek to vary any terms of the termination agreement and the terms of the oral contract are not inconsistent

with the termination agreement. We agree.

■■ ■ Under the parol evidence rule, if an instrument appears complete, certain, and unambiguous, then parol evidence of a prior or contemporaneous agreement is inadmissible to vary the terms of the instrument. (*Chicago White Metal Casting, Inc. v. Treiber* (1987), 162 Ill. App. 3d 562, 569, 517 N.E.2d 7, 12.) However, whether a written contract was intended to be the complete and final agreement must be determined from the language of the contract and the circumstances of the case. (*Bleck v. Stepanich* (1978), 64 Ill. App. 3d 436, 439, 381 N.E.2d 363, 366.) Whether an oral contract exists, its terms and conditions, and the intent of the parties are questions of fact to be determined by the trier of fact, in this case, the jury. (*Howard A. Koop & Associates v. KPK Corp.* (1983), 119 Ill. App. 3d 391, 400, 457 N.E.2d 66, 73.) This determination should not be reversed unless it is contrary to the manifest weight of the evidence. 119 Ill. App. 3d at 400, 457 N.E.2d at 73.

■■ Defendant contends that we may only consider the four corners of the written agreement; however, we find that we must look to the totality of the circumstances. The negotiations between the parties went on for an extended period of time, undeniably caused by delays of defendant. While defendant originally sought to keep plaintiff from competing against defendant in the landfill and waste management business, delays caused by defendant prompted plaintiff to acquire at least seven other waste management businesses between the parties' first meeting on February 19, 1980, and their final meeting on September 24, 1980. For simplicity's sake, these businesses were merged into the Global Waste Services accounts. It is undisputed that the parties signed an option agreement for the Trusik accounts, the Wagner landfill, and the Hazmat site. The written option agreement provided for a purchase price of $70,000 for the Trusik accounts, but failed to provide for price terms on the Wagner and Hazmat options. Defendant actually paid a total of $95,000 for the Trusik accounts. Defendant contends that it agreed to pay $25,000 more than the option provided only because more equipment was added to the transaction and because, overall, $95,000 was a good business deal. Plaintiff, on the other hand, testified that the additional $25,000 was paid because attorney Popeo, on behalf of defendant, had agreed to pay plaintiff an additional $200,000 to fairly compensate plaintiff for the Global Waste Services accounts and for his promise not to compete against defendant. The $200,000 was to be paid in three separate transactions, the first being an additional $25,000 for the Trusik accounts. Plaintiff contends the reason the parties agreed on three sepa-

rate transactions was because if the transaction was for $100,000 or less, Popeo could complete the transaction without approval by the defendant's board of directors. Plaintiff's attorneys, Long and Farrell, gave virtually the same testimony as plaintiff concerning the additional $200,000. In our opinion, the jury could reasonably find that the payment of $95,000 for the Trusik accounts, originally priced at $70,000, signified that there was a separate, oral contract between the parties, and, therefore, the termination agreement was not the final, integrated agreement between the parties. We cannot say that this finding is against the manifest weight of the evidence.

Defendant further contends that because the written termination agreement between the parties explicitly stated that the agreement contained the entire understanding between the parties and superseded all previous agreements, no evidence should have been considered or introduced construing the termination agreement. We must, however, consider this integration clause in context. Paragraph 1 of the termination agreement provides, in pertinent part:

"Hartbarger's employment by SCA is terminated as of the close of business on May 31, 1980. Hartbarger acknowledges receipt of payment in full of all salary, termination pay, and other compensation and benefits due to him as an employee of SCA, and agrees that he is not entitled to any further salary, termination pay, retirement or pension benefits or other compensation or benefits of any nature with respect to his employment by SCA or the termination thereof *** ."

Paragraph 12 then provides:

"This Agreement constitutes the entire agreement and understanding between the parties in relation to the subject matter hereof and there are no promises, representations, conditions, provisions or terms related thereto other than those set forth in this Agreement. This Agreement supersedes all previous understandings, agreements and representations between SCA and Hartbarger regarding the employment of Hartbarger by SCA and the termination of such employment, written or oral."

Taken in proper context, we agree with plaintiff that these clauses refer solely to compensation and benefits due plaintiff *as an employee* of defendant. The previously cited paragraphs do not refer to plaintiff's business acquisitions made between the time of the first meeting between the parties and their final meeting. The $200,000 did not attempt to vary the terms of the termination agreement between the parties. Rather, the $200,000 would adequately compensate plaintiff for his recently acquired businesses which he would be unable to be

involved in under the terms of the noncompetition clause.

Defendant argues that the parol evidence rule bars evidence of an oral contract made contemporaneously with a written contract and cites the case of *Roth v. Meeker* (1979), 72 Ill. App. 3d 66, 389 N.E.2d 1248. In that case, suit was brought to recover damages to the plaintiffs' pure-bred cattle-breeding operation allegedly resulting from the defendant's refusal to vacate possession of premises leased to the plaintiffs from the purchaser of the defendant's land. The defendant attempted to testify that he entered into an oral contract with the purchaser of his land to retain possession of certain lots around the farm buildings. The court held that the parol evidence rule barred this testimony, since it would have been normal for the parties to the written contract to have incorporated the oral contract subject matter in any prior or contemporaneous agreement.

We, however, find the *Roth* case distinguishable from the instant case. In *Roth*, the written contract provided for possession of the 364 acres of land sold to vest in the purchaser as of the date of the contract, April 9, 1976, with an exception for the dwelling house located on the farm. Possession of the home was to be retained by the defendant until October 1, 1976. The *Roth* court found that the evidence presented proved that the defendant was quitting the farming business. The main demonstration of this was defendant's participation in a public auction held on April 10, 1976, to close out his farming operation. The *Roth* court concluded that the defendant's situation at the time he entered into the contract with the purchaser was such that he did not need any agreement for possession of portions of the farm other than the house. The *Roth* court did not hold that parol evidence could never be used to prove the existence of a separate, contemporaneous oral contract between the parties.

In the instant case, the evidence demonstrated that the parties had been involved in negotiations for over seven months. Initially, Popeo had been given authority by defendant to work out a termination agreement with plaintiff on behalf of defendant. In a letter dated June 10, 1980, to plaintiff's attorney, Farrell, Popeo admitted that the delays in finalizing a termination agreement were caused by him. The initial talks included discussions about a noncompetition clause. Once the talks fell apart and no agreement was signed, plaintiff formed a number of businesses which were in direct competition with defendant. Unlike *Roth*, we believe the evidence presented here shows the need for a separate oral contract to compensate plaintiff adequately for his businesses acquired in the interim and for his agreement not to compete further with defendant. We also believe that Popeo's de-

lays in executing a termination agreement with defendant adequately explained the reasons for the separate oral contract. Popeo agreed to pay plaintiff an additional $200,000 in three separate transactions in order to avoid going to the board of directors for approval. Had the termination agreement been completed within a matter of weeks as originally planned, plaintiff would not have formed and acquired these new business ventures which were in direct competition with defendant, and there would have been no need to pay plaintiff an additional $200,000.

By our decision, we by no means wish to encourage these types of side agreements between parties. Under the facts in the instant case, however, the jury's determination that there was a separate oral contract to compensate plaintiff for his business ventures in direct competition with defendant was supported by the testimony of plaintiff, plaintiff's attorneys, and defendant's own actions in paying $95,000 for the Trusik accounts and will not be reversed by this court.

The second issue we are asked to address is whether sufficient independent consideration, definiteness, or certainty existed to support the separate oral contract. First, defendant argues that plaintiff failed to establish the existence of independent consideration from the written contract to support the oral contract. Defendant contends that the oral agreement lacked consideration because the parties had already agreed to options on the Trusik accounts, the Wagner landfill, and the Hazmat site in a written contract. Second, defendant argues that the oral contract lacked sufficient definiteness or certainty as evidenced by plaintiff's testimony as well as plaintiff's attorneys' testimony.

█■ ■ Consideration for a promise has been defined in Restatement (Second) of the Law of Contracts, section 71, as:

"(1) To constitute consideration, a performance or a return promise must be bargained for.

(2) A performance or return promise is bargained for if it is sought by the promisor in exchange for his promise and is given by the promisee in exchange for that promise.

(3) The performance may consist of

(a) an act other than a promise, or

(b) a forbearance, or

(c) the creation, modification, or destruction of a legal relation." (Restatement (Second) of Contracts §71 (1981).)

It is well settled that consideration is an essential element, and it is necessary to the validity or enforceability of a contract. (*Wickstrom v. Vern E. Alden Co.* (1968), 99 Ill. App. 2d 254, 260, 240 N.E.2d 401, 404.) Courts do not ordinarily inquire into the adequacy of consider-

ation, and any consideration, however slight, is legally sufficient to support a promise, except where the disparity is so gross as to raise a presumption of fraud. 99 Ill. App. 2d at 261, 240 N.E.2d at 405.

■ The written contract in the case at bar set forth various terms with which plaintiff would have to comply in order to receive benefits under the termination agreement. For example, plaintiff would not be able to compete with defendant for a period of two years under the terms of the written contract. However, plaintiff had seven businesses in direct competition with defendant before signing the termination agreement. In order to be able to sign the written contract, plaintiff had to dispose of these businesses. He explained that he had mortgages on these businesses and needed at least $200,000 for these businesses to make it worth his while to sign the termination agreement. For simplicity's sake, plaintiff merged these businesses into the Global Waste Services accounts. We find the transfer of the Global Waste Services accounts, which were businesses acquired by plaintiff during the period of limbo between his termination from defendant's employment and his signing of the termination agreement, was sufficient consideration to support the oral contract. Defendant's promise to pay plaintiff an additional $200,000 is, therefore, legally enforceable.

■ Defendant also contends that the oral contract lacked sufficient definiteness and certainty. As we previously explained, whether an oral contract exists, its terms and conditions, and the intent of the parties are questions of fact to be determined by the trier of fact. (*Howard A. Koop & Associates v. KPK Corp.* (1983), 119 Ill. App. 3d at 400, 457 N.E.2d at 73.) This determination should not be reversed unless it is contrary to the manifest weight of the evidence.

■ Defendant points out that, in the instant case, attorney Long testified that Popeo agreed to add on somewhere in the range of between $75,000 and $100,000 for the purchase of the Hazmat option. Defendant also points out that plaintiff made the statement, "In any event, Popeo was going to pay me my $200,000." Defendant contends that such testimony proves that any oral agreement lacked sufficient definiteness and clarity. On the other hand, plaintiff testified that under the terms of the oral contract, defendant had agreed to pay him an additional $200,000 to be paid in three installments with $25,000 being added to the Trusik option, $75,000 being added to the Wagner option, and $100,000 being added to the Hazmat option. The jury also heard testimony and saw evidence that defendant did, in fact, pay an additional $25,000 for the Trusik option by paying a total of $95,000 when $70,000 was the price written in the termination agreement.

Under these facts, we cannot say that it was against the manifest weight of the evidence for the jury to find that there was a separate oral contract between the parties under which plaintiff was to be paid an additional $200,000.

 Along this same line, defendant argues that plaintiff's instructions 10 and 11 were in error because they did not allow the jury to determine the price terms of the contract and did not allow the jury to consider what plaintiff was to do in exchange for $200,000.

Plaintiff's instruction number 10 read as follows:

"Plaintiff's Complaint alleges that Defendant breached an oral agreement with the Plaintiff.

Plaintiff must prove the following propositions:

A. That the Plaintiff and Defendant entered into an oral agreement for $200,000.00;

B. That the Defendant breached the oral agreement;

C. That Plaintiff has sustained damages due to Defendant's breach of the oral agreement.

The Defendant denies there was an oral agreement, denies the Plaintiff sustained damages therefrom, and denies that Plaintiff sustained damages to the extent claimed."

Plaintiff's instruction number 11 read as follows:

"The Plaintiff has the burden of proving each of the following propositions:

First, that Plaintiff and Defendant entered into an oral agreement for $200,000.00;

Second, that Defendant breached the oral agreement;

Third, that the Plaintiff sustained damages due to the Defendant's breach of the oral agreement.

If you find from your consideration of all the evidence that each of the propositions required for the Plaintiff has been proved then your verdict should be for the Plaintiff. If, on the other hand, you find from your consideration of all the evidence, that any one of the propositions the Plaintiff is required to prove has not been proved, then your verdict should be for the Defendant."

We have carefully reviewed the transcript of the instructions conference. At that time, defendant objected to the above-cited instructions based upon the fact that neither instruction allowed the jury to consider whether there was adequate consideration for the separate oral contract. Since the question whether adequate consideration exists is a question of law for the trial court (*Lesnik v. Estate of Lesnik* (1980), 82 Ill. App. 3d 1102, 403 N.E.2d 683), defendant's argument failed,

and the instructions were given. Defendant did not object at trial to the insertion of the $200,000 price term. On the contrary, defendant's own tendered instruction, which defendant contends alleviated the problems found in instructions 10 and 11, includes the $200,000 price term. Defendant's tendered instruction specifically reads:

"The Plaintiff has the burden of proving each of the following propositions.

First, there was an oral agreement entered into between the Plaintiff and Defendant in which Defendant agreed to pay Plaintiff $200,000.00, and Plaintiff agreed to do something he was not already obligated to do or Plaintiff refrained from doing something he was entitled to do;

Second, that the Defendant breached the oral agreement;

Third, that the Plaintiff sustained damages due to the Defendant's breach of the oral agreement."

We need not reach the merits of defendant's argument because it has been waived by the failure of defendant to object specifically to the price term at the instructions conference (*Lawson v. Belt Ry. Co.* (1975), 34 Ill. App. 3d 7, 24, 339 N.E.2d 381, 396), and further waived because defendant's own tendered instruction included the $200,000 price term.

The fourth issue we are asked to consider is whether the Statute of Frauds bars plaintiff's oral contract claim. Defendant contends that assuming, *arguendo*, an oral agreement to pay plaintiff $200,000 did exist, it would be unenforceable under the Statute of Frauds for three reasons: (1) defendant cannot answer for the debt of another; (2) the contract was to be performed over a period of years; and (3) the contract was for the sale of land.

Defendant is correct in that the Statute of Frauds provides that an action cannot lie on one's promise to answer for the debt of another unless such promise is in writing. (Ill. Rev. Stat. 1979, ch. 59, par. 1.) It has been held that a promise to pay the debt of another which is not written and signed cannot be enforced either in law or in equity. (*Brown & Shinitzky Chartered v. Dentinger* (1983), 118 Ill. App. 3d 517, 519, 455 N.E.2d 128, 129.) However, the promise to answer for the debt of another "has been defined as an undertaking by a person not before liable, for the purpose of securing or performing the same duty for which the original debtor continues to be liable." 72 Am. Jur. 2d *Statute of Frauds* §179, at 709 (1974).

In the instant case, the evidence presented was that defendant promised to pay plaintiff $200,000. The $200,000 figure was apparently agreed upon because plaintiff amassed substantial debt by ac-

quiring landfill property and businesses during the interim between the parties' first meeting concerning the termination agreement and the actual signing of the agreement. Plaintiff introduced evidence of this debt to show why the $200,000 amount was agreed upon. Plaintiff testified that he told attorney Popeo, "What you need to do is give me a couple of hundred thousand dollars, and that will cover the debt with a little something for the non-compete." Therefore, plaintiff was not asking defendant to pay his creditors, but rather, was asking for enough money so that he could pay off his creditors and have some money left for himself in return for his promise not to compete with defendant. No evidence was presented that defendant would become liable on the bank debt owed by plaintiff.

█ Defendant next argues that the oral contract violated the Statute of Frauds because the $200,000 was to be paid over a period of years. Specifically, defendant contends that since the payments were scheduled over a four- to five-year period, the contract is unenforceable because it was not reduced to writing.

The Illinois Statute of Frauds provides, in pertinent part:

"[N]o action shall be brought *** upon any agreement that is not to be performed within the space of one year from the making thereof ***." (Ill. Rev. Stat. 1979, ch. 59, par. 1.)

In Illinois, this has been determined to mean that a contract is unenforceable only if it is impossible to perform the contract within one year. (*Brudnicki v. General Electric Co.* (N.D. Ill. 1982), 535 F. Supp. 84, 86; *Sinclair v. Sullivan Chevrolet Co.* (1964), 45 Ill. App. 2d 10, 14, 195 N.E.2d 250, 252.) If, however, it appears from a reasonable interpretation of the terms of the agreement that it is capable of performance within one year, the Statute of Frauds is inapplicable. *Stein v. Malden Mills, Inc.* (1972), 9 Ill. App. 3d 266, 271, 292 N.E.2d 52, 57.

█ In the instant case, the $200,000 payment by defendant was to be made in three transactions. While attorney Long testified that these payments were scheduled over a period of four to five years, we find that these transactions could have been completed within one year. The evidence adduced at trial indicates that it was not impossible to perform the oral contract within one year; therefore, the oral contract did not violate the Statute of Frauds.

█ █ Defendant next contends that because payment was to be made by exercising the options for the sale of property, the oral contract fell within the Statute of Frauds and was in violation of said statute. Contrary to defendant's assertion, the option contracts on the Trusik, Wagner, and Hazmat properties were reduced to writing. The

parties had, however, agreed to add $200,000 more to the purchase price of these transactions in order to adequately compensate plaintiff for the Global Waste Services accounts. We do not, therefore, consider this a contract for the sale of land. Likewise, we find that the contract does not violate the Statute of Frauds provision of the Uniform Commercial Code (Ill. Rev. Stat. 1979, ch. 26, par. 2—201). An oral contract for the sale of goods, in this case the Global Waste Services accounts, which has been partially performed, is enforceable at the insistence of either party. (*Allied Wire Products, Inc. v. Marketing Techniques, Inc.* (1981), 99 Ill. App. 3d 29, 37, 424 N.E.2d 1288, 1294.) Defendant's payment of $95,000 rather than the written term of $70,000 constitutes partial performance on the oral contract and, thus, takes the oral contract out of the Statute of Frauds and removes the statute as a bar to enforcement of the contract.

The final issue we are asked to consider is whether the verdict is supported by the evidence. Defendant argues that the jury's verdict was excessive and was not supported by the evidence. For these reasons, defendant contends it is entitled to a new trial or, in the alternative, a remittitur. Specifically, defendant argues that the jury's verdict of $225,000 placed plaintiff in a better position than he would have been had the oral contract been performed. Defendant argues that since plaintiff had already been paid $25,000 on the Trusik accounts, plaintiff was entitled to recover only $175,000. Defendant contends the only logical explanation for the award of $225,000 was that the jury speculated as to the amount of interest accumulating on plaintiff's loans, as no evidence as to the amount of interest plaintiff paid was presented. Plaintiff replies that the jury has some latitude in returning the amount of damages and the record adequately supports the verdict. We agree.

The question of damages is largely within the discretion of the jury, and courts of review will not interfere with a jury's assessment of damages unless:

> "(1) the award is palpably inadequate or a proved element of damages has been ignored; (2) the amount of the verdict is shown to be erroneous or the result of passion or prejudice; or (3) it clearly appears from uncontradicted evidence that the amount of the verdict bears no reasonable relationship to the loss suffered by the plaintiff." (*Ryan v. E.A.I. Construction Corp.* (1987), 158 Ill. App. 3d 449, 463, 511 N.E.2d 1244, 1253.)

A person breaching a contract can be held liable for any damages that may fairly and reasonably be considered as arising from the breach in light of the facts which were known or should have been known.

*Naiditch v. Shaf Home Builders, Inc.* (1987), 160 Ill. App. 3d 245, 267, 512 N.E.2d 1027, 1240.

A review of the record in the instant case leads us to conclude that the jury award was properly based on the evidence. Plaintiff presented sufficient evidence concerning the amount he owed on the Global Waste Services debt and interest accruing thereon at at least two separate banks. Plaintiff also presented evidence as to the amounts he paid out of his own pocket on the Global Waste Services debt. While the jury is not allowed to speculate, its members are allowed to use their experiences in life in determining the amount of money which will adequately compensate plaintiff for a breach of contract. (Illinois Pattern Jury Instructions, Civil, No. 1.04 (2d ed. 1971).) The award of $225,000 does not put plaintiff in a better position than he would have been had the oral contract been performed nearly eight years ago as originally scheduled. This verdict in no way shocks the judicial conscience. Instead, we find the award to be within the jury's discretion, and we will not interfere with the jury's determination.

For the foregoing reasons, the judgment of the circuit court of Madison County is affirmed.

Affirmed.

LEWIS, P.J., and HOWERTON, J., concur.