In the

# United States Court of Appeals

## For the Seventh Circuit

No. 16-3499

PINE TOP RECEIVABLES OF ILLINOIS, LLC,

*Plaintiff-Appellant*,

*v.*

BANCO DE SEGUROS DEL ESTADO,

*Defendant-Appellee*.

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 12 C 6357 — **Marvin E. Aspen**, *Judge*.

ARGUED APRIL 6, 2017 — DECIDED AUGUST 7, 2017

Before EASTERBROOK, MANION, and HAMILTON, *Circuit Judges*.

EASTERBROOK, *Circuit Judge*. Between 1977 and 1984 Pine Top Insurance Company (the Insurer) and Banco de Seguros del Estado (Banco) entered into five treaties, by which Banco reinsured about 2% of the Insurer's business. The Insurer stopped writing policies in 1985, went into receivership in 1986, and began liquidating in 1987. But there were still investments to manage, premiums to collect, and claims to pay

on old policies, which meant that the liquidator had to run the business for many years.

Through 1993 the liquidator complied with the treaties' provisions requiring balances to be calculated quarterly and statements sent. If the Insurer owed reinsurers net balances on the previous quarter's business, it paid them; if the reinsurers owed the Insurer (because claims paid exceeded revenues), bills were sent and became due. After November 1993, however, the liquidator stopped sending either checks or bills. Silence ensued; the liquidator did not explain the absence of new statements, checks, or bills. Fifteen years later the liquidator sent Banco two notices: first, the net on all 1993 through 1999 business was in Banco's favor, and it was owed about $225,000 for that period; second, the net for periods before 1993 was about $2.5 million in the Insurer's favor. The liquidator set off the two amounts and demanded more than $2 million. Banco did not reply until 2010, when it protested the 2008 bill as untimely.

In 2010 Pine Top Receivables of Illinois (which we call Pine Top) bought all of the Insurer's receivables. Two years later it sued Banco in federal court to collect the balance. Banco did not counterclaim for the $225,000, because the liquidator retained the Insurer's debts. Litigation about procedural issues, many arising from the fact that Banco is wholly owned by Uruguay, consumed several years and led to our decision in *Pine Top Receivables of Illinois, LLC v. Banco de Seguros del Estado*, 771 F.3d 980 (7th Cir. 2014). Banco's limitations defense remained for consideration in the district court. The district court granted summary judgment in its favor, ruling that Pine Top's claim is roughly a decade late. 2016 U.S. Dist. LEXIS 70462 (N.D. Ill. May 31, 2016), reconsidera-

tion denied, 2016 U.S. Dist. LEXIS 116181 (N.D. Ill. Aug. 30, 2016).

The reinsurance treaties have slightly different language, which the district court's thorough opinion sets out. We omit details, because what matters now is the treaties' structure: each requires scheduled netting of claims and payment of the balance in whichever direction it lies. That was done through 1993. Then in 2008 the liquidator sent Banco a bill for pre-1993 balances, which under the treaties' language should have been stated and collected long ago. The district court concluded that the claims against Banco accrued no later than 1993. The treaties provide for use of Illinois law, which gives ten years (until 2003) to sue on contracts. 735 ILCS 5/13-206. Yet Pine Top did not sue until 2012.

Pine Top does not contest this understanding of ordinary contract principles. But it insists that ordinary principles do not apply to insurance liquidation in light of 215 ILCS 5/206. That statute reads:

> In all cases of mutual debts or mutual credits between the [insolvent insurance] company and another person, such credits and debts shall be set off or counterclaimed and the balance only shall be allowed or paid, provided, however, that no set-off or counterclaim shall be allowed in favor of any person where
>
> > (a) the obligation of the company to such person was purchased by or transferred to such person with a view of its being used as a set-off or counterclaim, or
> >
> > (b) the obligation of such person is to pay an assessment levied against the members or subscribers of any company which issued assessable policies, or to pay a balance upon a subscription to the shares of a stock company.
>
> No set-off shall be allowed in favor of an insurance agent or broker against his account with the company, for the unearned por-

> tion of the premium on any cancelled policy, unless that policy was cancelled prior to the entry of the Order of Liquidation or Rehabilitation, and unless the unearned portion of the premium on that cancelled policy was refunded or credited to the assured or his representative prior to the entry of the Order of Liquidation or Rehabilitation.

Pine Top tells us that this statute allows the liquidator to ignore the treaties, wait until the end of the liquidation, and then submit one bill netting multi-decade balances across multiple treaties.

The district judge was not persuaded, and neither are we. The statute does not provide that a liquidator may wait until the very end to net the firm's debits and credits. All it tells us is that balances must be netted and only the net paid. Netted how frequently? Over what period? Paid when? The statute does not say. The district judge thought that the most suitable period is the one the parties themselves chose. And the judge added that the state judiciary has not held or even hinted that liquidators may wait indefinitely. One court held that, if a liquidator proposes a time for netting and a judge approves that proposal after notice and a hearing, then the approved time governs. *In re American Mutual Reinsurance Co.*, 238 Ill. App. 3d 1 (1992). But the Insurer's liquidator did not obtain judicial approval for delay. There's no statutory basis for thinking that a liquidator has *carte blanche* to do the netting any time he pleases and thus to deprive reinsurers of the benefit of negotiated deadlines and extend the statute of limitations for—well, potentially forever.

Pine Top offers a second contention: that the 2008 bill was an "account stated." In Illinois, as in most other jurisdictions, the parties to a contract may resolve differences about who owes how much to whom and pick a definitive num-

ber. This kind of agreement establishes a new contract and starts its own period of limitations. Judges call agreement on a bottom line an "account stated." According to Pine Top, when Banco did not respond promptly to the 2008 statement, that was as good as an agreement and permitted a suit any time within the next ten years.

Banco protests that it did not receive the statement until 2010 and blames problems in international mail. No matter. Failure to respond to a proposal differs from acceptance. If after a dispute about property lines Jones sends his neighbor Smith a letter asserting that Smith must pay him $2 million, and Smith throws the letter in the garbage, Smith does not owe Jones a penny. Nor can Green acquire Brown's prized cat by sending a letter offering $1 that Brown ignores. It takes an offer and acceptance to form a contract—and the judiciary in Illinois tells us that an account stated is a kind of contract. See, e.g., *Toth v. Mansell*, 207 Ill. App. 3d 665, 671–72 (1990); *Allied Wire Products, Inc. v. Marketing Techniques, Inc.*, 99 Ill. App. 3d 29, 39–40 (1981). The liquidator made a proposal, Banco did not accept, a contract was not formed, and the "account stated" claim fails.

The district court was right to dismiss this suit as untimely.

AFFIRMED